**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**George GREEN and Barbara Waldo,**
**Defendants-Appellants.**

**Nos. 83–1966, 83–2230.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1984.

Decided May 24, 1984.

Terry K. McClellan, McClellan & Hirsh, Romeoville, Ill., Marc R. Kadish, IIT Chicago Kent School of Law, Deborah Fiorito Mitchell, Chicago, Ill., for defendants-appellants.

Daniel C. Murray, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and HENLEY, Senior Circuit Judge.*

COFFEY, Circuit Judge.

Defendants-appellants, George Green and Barbara Waldo, were convicted of conspiring to receive, possess, and sell goods known to be stolen from an interstate shipment in violation of 18 U.S.C. §§ 371, 659. Waldo was also convicted of one count of possessing stolen goods in violation of 18 U.S.C. § 659. We affirm.

## I.

On August 4, 1982 an indictment was filed charging George Green and Barbara Waldo with conspiring to possess jewelry stolen from interstate commerce and possession of stolen jewelry. Jerry Waldo, Robert Tuohey, Marilyn Tuohey, and Richard Neubeck were also charged in the same indictment. Green and Barbara Waldo were tried to the court and found guilty. Neubeck was acquitted and the others were found guilty after entering pleas of guilty. The testimony at trial established that on April 26, 1981, Morris Goodman, a jewelry designer and manufacturer, flew via U.S. Air from Indianapolis to Chicago, and boarded a United Airlines flight to Spokane, Washington. Two sample bags Goodman checked as baggage in Indianapolis failed to arrive as scheduled in Spokane and were last seen by a United Airlines supervisor on the evening of April 26, 1981 in the United Airlines Baggage Facility at O'Hare International Airport, Chicago, Illinois. A search of the Baggage Facility for

* The Honorable J. Smith Henley, United States Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

the lost jewelry conducted the following day proved unfruitful. The sample bags contained approximately 2,000 rings and other various pieces of jewelry with a retail value of approximately $800,000. It was established that the defendant George Green and Jerry Waldo (Barbara Waldo's husband) were employed by United Airlines as baggage handlers at O'Hare International Airport and were working during the early morning hours of April 27, 1981. At trial a United Airlines supervisor testified that it would not have been too difficult for an employee to remove the luggage from the Baggage Facility to the adjacent public parking lot without being detected.

At trial, the government called Mr. Richard Tisch, a self-employed retail jeweler, who testified that in October of 1981 he received a telephone call from Green who stated "he knew a couple of guys in the jewelry business" who were "liquidating" to raise money and were willing to sell some rings at a good price if he was interested. Tisch stated that on previous occasions he had conducted business with Green, selling coins or purchasing items of jewelry from him. Tisch replied that he was interested in the rings and Green made arrangements for Tisch to meet with the sellers on October 11, 1981, at Green's home. This agreement to sell was conditioned upon the premise that Green would receive a commission if a sale was consummated. At trial the government established that when Tisch arrived at Green's home, Green introduced him to two men, Jerry Waldo and Robert Tuohey. Tuohey, like Green and Waldo, was also employed as a United Airlines baggage handler.

At the October 11th meeting, Tisch agreed to purchase the 90–100 rings Tuohey and Waldo had on display for $150.00 each. Waldo and Tuohey insisted upon cash, necessitating that Tisch return the next day with the money. Tisch testified that during the negotiations with Waldo and Tuohey, Green was present in the room during "probably twenty-five percent" of the time. When Tisch returned with the money, he paid Green between $700 and $900, as a commission, prior to the arrival of Tuohey and Waldo. Green admonished Tisch not to tell the sellers about the commission payment. Thereafter, Tisch, Waldo and Tuohey completed the jewelry transaction.

Tisch testified that "a couple of weeks later" Green again called him and asked if he was interested in purchasing more jewelry since "the two guys were liquidating more, they had pendants and bracelets and necklaces, and lockets and other things that pertained to the jewelry business, and they were going to sell those." Green arranged for another meeting with Tisch at his home (Green's) on that date, Tuohey and Waldo displayed another 200–400 rings. Tisch testified he became suspicious at this time that the jewelry was probably stolen and therefore "pretended [only] to look" for about five minutes. He advised Waldo and Tuohey that he "would have to have an hour to think about [the transaction]." He suggested the sellers contact him at his store within the hour and departed. Shortly thereafter, Green called Tisch to ascertain whether he had decided to purchase the rings. Tisch stated that the price was too high and that he primarily went to Green's home to look at jewelry other than rings, and decided that he "just wasn't interested." Green said "that he would talk [to the sellers] to see if they could do something." Green called back a short time later stating that the sellers "reduced the price quite a bit." Tisch replied he was "just not interested." Once again Green called Tisch offering to reduce the price even lower, but Tisch repeated his earlier refusal to purchase. Sometime after this date, Tisch turned over to the FBI the rings initially purchased from Waldo and Tuohey. This jewelry was identified as part of the loot from the United Airlines O'Hare Baggage Facility theft.

Mary Lou Ronzone, a government witness who operated a jewelry business out of her suburban Chicago home, testified that in May of 1981, she was introduced to Waldo and Tuohey by Richard Neubeck who described Waldo and Tuohey as "two principals" who had a million dollars worth

of jewelry for sale. Neubeck, charged in the United Airlines theft with Green, Waldo, and Tuohey, was also employed as a United Airlines baggage handler at O'Hare Field. Mrs. Ronzone stated that she purchased a substantial amount of jewelry from Tuohey and Waldo in her home during the months of May through December, 1981. She testified that through June and July 1981, the plaintiff-appellant Barbara Waldo and Marilyn Tuohey accompanied their husbands to her home "at least eighty to ninety percent of the time" when jewelry sales were consummated. According to Mrs. Ronzone, Barbara Waldo was present on several occasions when Jerry Waldo (her husband) and Robert Tuohey insisted that the jewelry not be sold in the Chicago or Indiana area. In addition, Mrs. Ronzone testified that on October 27, 1981, she provided Jerry Waldo with a check made out to "cash" as partial payment for jewelry previously purchased. That check, as received in evidence, was endorsed by both Barbara H. Waldo and Jerry Waldo.

Ronzone stated she made her final purchase of jewelry from the Waldos and Tuoheys on December 15, 1981. Sometime prior to that meeting, she (Ronzone) contacted the FBI concerning her suspicions that the jewelry purchased might have been stolen. The FBI suggested and received permission to place a recording device in her home. Using money furnished by the FBI, Mrs. Ronzone purchased $1,000 worth of jewelry on December 15, 1981. The trial admitted into evidence two hours of tapes of the negotiations leading up to the jewelry sale. These tapes reflect that Barbara Waldo was well acquainted and friendly with the co-conspirators at this time, and, in fact, was an active participant in handling the jewelry, counting the jewelry, and commenting as to its quality. For example, after Mrs. Ronzone commented on the amount of money she was paying for the jewelry, Barbara Waldo told her that "[y]ou'll get it back ten-fold." As was the case with the jewelry earlier purchased by

Tisch, this jewelry was determined to be part of the contraband merchandise from the baggage theft.

At the conclusion of trial, the court found Green not guilty of possessing the stolen jewelry but guilty of conspiring to possess it and sentenced him to five years imprisonment and suspended all but ninety days of imprisonment, with the remaining sentence to be served under probation supervision. While Barbara Waldo was charged with four counts of possession of stolen jewelry, she was only found guilty of one count of possession (on December 15, 1981) along with conspiring to possess the stolen jewelry. The trial court, after rendering a verdict of guilty as to two of the crimes charged, imposed a sentence for each crime, suspended those sentences and placed her on four years probation for each crime, to be served concurrently.[1] On appeal, Green and Barbara Waldo challenge the sufficiency of the evidence in support of their respective convictions.

## II.

When a reviewing court examines the sufficiency of the evidence in support of a criminal conviction, the critical inquiry is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In *Jackson v. Virginia*, the Court also recognized that it is the trier of fact's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Our court has recently reaffirmed its commitment to the principles enunciated in *Jackson v. Virginia* and thoroughly explained the import of these principles:

"In every criminal trial, each party asks the trier of fact to believe its wit-

---

1. The record submitted to this court does not disclose (has not been typed) the length of the sentences imposed.

nesses, to weigh its evidence more heavily than the opposition's evidence, and to draw certain inferences from the basic facts in evidence in order to accept its hypothesis regarding the events in dispute. When a defendant is found guilty, 'the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). *See also Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). This leads to the reasonable doubt test, under which the reviewing court in a criminal case must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original). Thus, it follows that when the factfinder is asked to draw conflicting inferences from the facts in evidence in order to choose between conflicting hypotheses, the reasonable doubt test requires the reviewing court to consider the evidence according to the prosecution's inferences. The hypothesis of innocence test, on the other hand, requires the reviewing court to put aside the prosecution's inferences and to determine whether the trier of fact could reasonably conclude that the evidence is inconsistent with the defendant's hypothesis. It is therefore clear that the two tests are not equivalent, and only one of them should provide the appropriate standard of review. Relying on the United States Supreme Court's discussion in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), we reaffirm our commitment to the reasonable doubt test as the sole test for reviewing the sufficiency of the evidence in criminal cases."

*United States v. Moya,* 721 F.2d 606, 609–10 (7th Cir.1983) (footnote omitted). In ad-

dition, our court has recognized "that circumstantial evidence plays a substantial role in conspiracy trials because of its relevance in establishing conspiracies and the general inability to obtain direct evidence of a conspiratorial agreement." *United States v. Roman,* 728 F.2d 846, 858 (7th Cir.1984). While affirming a conspiracy conviction, our court has also recently recognized that:

"it is also imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court 'must use its experience with people and events in weighing the chances that the evidence correctly points to guilt against the possibility of innocent or ambiguous inference....' "

*United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983) (*quoting United States v. Kwitek,* 467 F.2d 1222, 1226 (7th Cir. 1972), *cert. denied,* 409 U.S. 1079, 93 S.Ct. 702, 34 L.Ed.2d 668 (1972)). Finally, it is important to recognize that "[o]nce a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict." *United States v. Xheka,* 704 F.2d 974, 988 (7th Cir.1983) (*citing United States v. Melchor-Lopez,* 627 F.2d 886 (9th Cir.1980)).

### III.

#### A. George Green.

The defendant-appellant, George Green, contends that the evidence at trial at best merely provided the basis for an inference that he was an outsider to the conspiracy who unknowingly furthered its objectives. He argues that he only acted as a "broker" for the sale of the jewelry between Richard Tisch and the sellers, Robert Tuohey and Jerry Waldo, in an effort to receive a commission from Tisch.

Green argues that the government failed to establish that he was working in the Baggage Facility with Tuohey and Waldo on April 27, 1981, the date the jewelry disappeared. He therefore contends that

the government did not establish that he participated in or had any knowledge of the conspiracy on that date. Our review of the evidence in "a light most favorable to the prosecution," *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789, demonstrates that Green was in fact working in the same area with Tuohey and Waldo on April 27, 1981.[2] This was established at trial through the testimony of a United Airlines Supervisor based on his examination of United Airlines' employment records.

We disagree with Green's assertion that he was a mere broker trying to make a commission and note the overwhelming evidence of his active involvement and his continuous efforts in aid of the conspiracy to sell stolen jewelry. Green does not challenge the evidence that he normally worked on the same shift and in the same area as Waldo and Tuohey, and that he was personally acquainted with them. Nor does Green challenge the testimony that some six months after the disappearance of the jewelry, he introduced his two co-employees (Waldo and Tuohey) to Tisch as "jewelers" liquidating their business, in an effort to assist them ("jewelers") to procure a buyer for jewelry. Green would have us believe that he was just a "good guy" trying to help out friends and unwittingly furthered the objectives of a conspiracy when, in fact, he: (1) arranged for the parties to meet in his house to consummate a $15,000 jewelry transaction, (2) was paid a $700 to $900 commission for that sale, and (3) made renewed efforts to aid in the sale of additional "hot" jewelry.

He argues that there was no reason for him to suspect anything other than that his co-workers were somehow in a sideline of selling jewelry and chose him to be their broker. Considering the totality of Green's involvement with the conspiracy—(1) he worked in the area where the jewelry disappeared; (2) he later introduced two co-

employees as "jewelers"; (3) he made the arrangements for these alleged "jewelers" to sell approximately 100 high-quality rings for $15,000 "cash" in the kitchen of his home; and (4) he made further efforts to aid in the sale of an additional 200–400 rings—his argument of lack of knowledge of the conspiracy defies logic, common sense and reason.

Green points out that he entered into prior commission agreements with Tisch before he introduced him to Tuohey and Waldo, arguing that acting as a "broker" was "usual and ordinary." This argument also fails as the record establishes that his prior jewelry transactions with Tisch were on a very limited scale involving private individuals (who were not "jewelers") which did not approach the magnitude of the $15,000 transaction involving some 100 rings he arranged. Further, had Green been a legitimate broker it strains logic to believe that he would have instructed Tisch *not* to tell the sellers (Waldo and Tuohey) that he (Tisch) had paid Green a commission. Legitimate brokers need not and do not attempt to "hide" their commissions.

In an effort to isolate himself from the conspiracy, Green points to the evidence establishing that he did not handle the jewelry or the money used to purchase it, and that he was never entrusted with the jewelry even while Tisch obtained the necessary cash. According to Green, this evidence bolsters the inference that he was only a broker unaware of any criminal activity. Even if we accept Green's view of the evidence, the court's decision was proper since "[a] party need not know all of the purposes and details of a conspiracy to be proved a co-conspirator.... It is sufficient that the government prove a connection between the defendant and the conspiracy." *United States v. Frans*, 697 F.2d 188, 190 n. 1 (7th Cir.1983). It is clear that the government proved far more than just

---

**2.** A contrary conclusion would not prevent a finding that Green was a member of the conspiracy, considering the sum of the evidence introduced against him, since a "defendant may be found guilty of conspiracy even if he did not join the conspiracy until after its inception,

*United States v. Robertson*, 659 F.2d 652, 656 (5th Cir.1981), and even if he plays only a minor role in the total scheme, *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir.1980) (*en banc*)." *United States v. Tamargo*, 672 F.2d 887 (11th Cir.1982).

a mere "connection." Furthermore, "while 'mere presence at the scene of the crime or mere association with conspirators will not themselves support a conspiracy conviction ... presence or a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy.'" *United States v. Xheka,* 704 F.2d at 989 (*quoting United States v. Mancillas,* 580 F.2d 1301, 1308 (7th Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978)).

■ We believe the record, when viewed in a light most favorable to the government, contains more than sufficient evidence for the trier of fact to find that George Green did in fact knowingly, and actively participate in the conspiracy to receive, possess and sell the stolen jewelry through his provision of assistance to Waldo and Tuohey in arranging the sale of the stolen jewelry. Green does not challenge the government's theory of the existence of the conspiracy to sell stolen jewelry, but only that he was isolated from that conspiracy. However, the law is clear that "[o]nce a conspiracy is shown to exist, evidence that establishes a particular · defendant's participation beyond a reasonable doubt, although the connection between the defendant and the conspiracy is slight, is sufficient to convict." *United States v. Xheka,* 704 F.2d 974, 988 (7th Cir.1983). Relying on *United States v. Xheka,* we view the evidence linking Green with the conspiracy as far more than slight. As our court recognized in *Xheka,* "[t]his [case] is a far cry from the typical 'mere presence' case in which the alleged conspirator has no demonstrated stake in the conspiracy and contributes nothing to its success." 704 F.2d at 989. We hold that the record contains more than sufficient evidence to allow the trier of fact to conclude beyond a reasonable doubt that Green was guilty of conspiring to receive, possess, and sell the stolen jewelry.

## B. Barbara Waldo.

The defendant-appellant, Barbara Waldo, contends that she was not a willful and knowing member of the conspiracy but rather was merely present at the scene of the crime with knowledge that a crime was committed. As previously pointed out, it is a "well-established rule that mere association, knowledge or approval of a conspiracy is not sufficient to prove a defendant's guilt." *United States v. Xheka,* 704 F.2d 974, 989 (1983). However, the rule does not apply to the present case for the evidence demonstrates that Barbara Waldo was a far more active participant in the conspiracy than she would have us believe.

Significant evidence was presented concerning Barbara Waldo's membership in the conspiracy through the tape of the December 15, 1981, jewelry transaction at the Ronzone residence which resulted in Mrs. Ronzone's purchase of stolen jewelry with funds supplied by the FBI. We note that Mrs. Waldo initially told FBI agents that she had no knowledge of the jewelry theft, much less knowledge of or participation in the recent sale. In her initial explanation to the FBI agents, she simply stated that she was "just along for the ride." Notwithstanding those denials, Barbara Waldo now concedes that she was "present [at the December 15th jewelry transaction] and aware that the jewelry was stolen." The tape of the December 15th transaction demonstrates that Barbara Waldo was not "just along for the ride" and provides unequivocal evidence that she was knowingly involved in what she now admits was an illegal transaction.

Specifically, the record shows that she: (1) sat at the table during the negotiations concerning the sale of the stolen jewelry; (2) handled the jewelry she now admits she knew was stolen; (3) counted the stolen items about to be sold; (4) commented on the quality of the stolen jewelry; (5) asserted that Mrs. Ronzone would gain a "tenfold return" on the jewelry; and (6) told Mrs. Ronzone she could have a 30-day money-back guarantee. After listening to the tape and reading the transcript thereof, the district court concluded that Barbara Waldo

"participated in the conversations that day with regard to quantity, quality, price, desirability, personal wants. She was not the ignorant onlooker that the cases speak of in some instances."

Our review of the record compels us to agree with the district court's conclusion and statements that her actions were not that of an "ignorant onlooker." The totality of the circumstances surrounding the entire jewelry transaction amply supports the trial court's finding that Mrs. Waldo was a knowing and willing participant in the conspiracy rather than a person merely present who "contributes nothing to its success." *Xheka*, 704 F.2d at 989.

■ The defendant argues that since Judge Marshall based his finding of guilt on the conspiracy count only upon the evidence relating to the December 15th jewelry transaction, and acquitted her on the other substantive possession offenses, we are collaterally estopped from considering any other evidence in connection with her guilt as to the conspiracy conviction. We hasten to point out that when we review a conviction we review the record as a whole and that a judge, as the trier of fact, is deemed only to have considered the relevant evidence before him. Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "Broad discretionary powers in determining the relevancy of evidence is vested with the trial court, and the court has the duty of balancing the probative value of any evidence against any prejudice when determining the issue of admissibility." *United States v. Sweeney*, 688 F.2d 1131, 1144 (7th Cir.1982). Therefore, if there is evidence in the record relevant to proving the offense charged, the court may consider it in its discretion.

■ The record does not support the defendant's argument that the court's ruling was based solely upon the tape of the December 15th transaction. Judge Marshall specifically stated that he based his ruling not only upon the tape of the December 15th transaction, but also upon "other corroborating evidence." There is, in fact, separate and distinct corroborating evidence of Barbara Waldo's presence at the Ronzone home when stolen jewelry was sold on occasions other than the three dates for which she was acquitted of possessing the jewelry (the court found her not guilty of possessing the jewelry on August 17, 1981, October 5, 1981, and November 2, 1981). For example, with regard to the purchases made through June and July, 1981, Mrs. Ronzone stated that "at least eighty to ninety percent of the time both husbands and wives [Jerry and Barbara Waldo, Robert and Marilyn Tuohey] accompanied Richard Neubeck when there was a payment [for jewelry] to be made." Mrs. Ronzone also testified that Barbara Waldo was present at her home on July 28, 1981 when a payment for stolen jewelry was made. Her memory was so clear that she noted on this date (July 28th) Barbara Waldo was wearing an "evening gown" as the Waldos and Tuoheys were "going out partying." In addition, Mrs. Ronzone stated that as of July 28th, all of the parties involved in the transaction (including Barbara Waldo), knew that the jewelry involved "was Goodman manufactur[ed] jewelry from Indianapolis, Indiana." She further testified that "at least four or five times," the parties discussed, in Barbara Waldo's presence, the caveat that the jewelry not be sold in the Chicago or Indiana area. The placement of this condition on the location where the jewelry could not be sold is more than a mere indication that the jewelry was "hot." Finally, Mrs. Ronzone testified that on another occasion in July 1981, Barbara Waldo was present when a jewelry sale was consummated, recalling that there were ten emerald necklaces offered for sale and that "we women [Ronzone, Barbara Waldo, and Marilyn Tuohey] were trying them on and kind of playing with them." While Barbara Waldo was not indicted for possession for her participation in the sales of the stolen jewelry during June or July 1981, this evidence corrobo-

rates her involvement in the overall conspiratorial scheme.[3]

There is no specific reference in the record to the trial court's reliance upon any evidence adduced at trial concerning the 8/17/81, 10/5/81, and 11/2/81 possession counts for which Barbara Waldo was acquitted. It is clear, however, that the court could have considered evidence of her prior acts, on dates other than those three, under Federal Rule of Evidence 404(b) if relevant. Rule 404(b) permits the use of evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." For example, the evidence of Barbara Waldo's participation in the conspiracy and presence in the Ronzone home in June and July 1981, in the immediate area where the sales of the stolen jewelry were being transacted clearly provides proof of her *knowledge* of the existence of the overall *plan* to dispose of the stolen jewelry and proof of her *opportunity* and *intent* to be a member of the conspiracy from its earliest stages. This evidence contradicts her contention that she was "just along for the ride" on December 15th, as her prior acts were consistent with the *modus operandi* of the conspirators on December 15. Furthermore, the separate and distinct evidence establishing that she knew of the restrictions regarding where the jewelry could not be sold is proof of her *knowledge* that the jewelry was contraband.[4]

In further support of Mrs. Ronzone's testimony, the tape of the December 15th transaction clearly reflects that Barbara Waldo was acquainted with Mrs. Ronzone prior to that date. Also received in evidence was a $600.00 check made out to cash that Mrs. Ronzone testified she gave to Jerry Waldo on October 27, 1981 in partial payment for jewelry she had just purchased from him. The check is endorsed by both Barbara Waldo and Jerry Waldo and provides additional corroborating evidence of Barbara Waldo's knowledge of and active participation in the ongoing conspiracy. Finally, Mrs. Ronzone's husband testified concerning the jewelry purchases made by his wife and stated that Barbara Waldo and Marilyn Tuohey accompanied their husbands to the Ronzone home "approximately 6, 7 times." The sum of this corroborating evidence clearly points to Barbara Waldo's participation in, and knowledge of, the conspiracy well before December 15, 1981.

 Barbara Waldo's estoppel argument also appears to be based upon the premise that the court found the Ronzones' testimony incredible. As defined by the Supreme Court, collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any *future lawsuit*." *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970) (emphasis added). *See also United States v. Castro*, 629 F.2d 456 (7th Cir.1980). Clearly, in this case the government did not attempt to relitigate an issue of ultimate fact resolved in a prior proceeding in a separate "future lawsuit," rather, the instant case merely presents an appeal of the district court's judgment. Thus, under the present facts the doctrine of collateral estoppel is simply inapplicable. However, were we to consider this appeal as the type of "future lawsuit" referred to in *Ashe* and *Castro*, the "ultimate fact" which Barbara Waldo contends was resolved in her favor is her presence at the

---

**3.** Note that the above-mentioned evidence concerns dealings on dates other than those for which she was acquitted of possessing the jewelry.

**4.** The following excerpt from the transcript made from the tapes of the December 15th transaction is further evidence of Barbara Waldo's knowledge that the jewelry was stolen before the December 15th transaction:

"BARBARA WALDO: ... Jerry you're not gonna keep that black ring, are you?
"JERRY WALDO: For a while. Why, you like it?
"BARBARA WALDO: No, I just don't think you should keep wearing all kinds of different rings.
"JERRY WALDO: I get tired wearing the same ring all the time.
"BARBARA WALDO: Well don't wear 'em around my family."

Ronzones' home on the dates for which she was charged with possession. That "fact," according to Barbara Waldo, is dependent on the credibility of the Ronzones. Contrary to what we discern is her (Barbara Waldo's) argument, the record reveals that the credibility issue was not resolved in her favor as the trial judge, while finding the Ronzones' evidence insufficient to convict her of possession on those three specific dates, emphatically refused to label their testimony as "not truthful." Barbara Waldo's acquittal on the three possession counts does not bar this court from considering other separate and distinct corroborating evidence in the record concerning her involvement in and knowledge of the ongoing conspiracy. It is well-established that "the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses," *Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946), and that "[a]quittal on a substantive count does not bar conviction for conspiracy unless there is an identity of the proof necessary." *United States v. Isaacs*, 493 F.2d 1124, 1152 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). We hold that in addition to the tape recordings the record contains further corroborating evidence of Barbara Waldo's involvement in the charged conspiracy and that we may consider that evidence in reviewing her conviction. We hold there is sufficient evidence for a trier of fact to find Barbara Waldo guilty of the conspiracy as charged.[5]

Barbara Waldo finally argues that the extent of her dominion and control over the jewelry on December 15, 1981, was insufficient to convict her of possessing stolen jewelry on that date. She contends that her husband and Robert Tuohey had "control" over the jewelry and that she was not present at O'Hare at the time of the jewelry theft nor did she have access to it because she was not employed at O'Hare. Her proximity to O'Hare at the specific time the jewelry disappeared is irrelevant to the question of whether she possessed any of that jewelry on December 15, 1981. The evidence of Barbara Waldo's participation in the conspiracy is overwhelming and the tape of the December 15, 1981 transaction reveals that Barbara Waldo actually handled and counted earrings and rings which she admits she knew were stolen at the time she handled them.

▪ Defendant Barbara Waldo directs our attention to the following language from *United States v. Parent*, 484 F.2d 726 (7th Cir.1973), as authority for her argument that she did not possess the stolen jewelry:

> " 'Generally, it is held that possession is dependent upon the extent of the defendant's dominion and control over the stolen property.' *United States v. Nitti*, 444 F.2d 1056, 1057 (7th Cir.1971). That dominion must not be 'a passing control, fleeting and shadowy in its nature,' but actual control. *United States v. Wainer*, 170 F.2d 603, 606 (7th Cir.1948). Actual possession may arise from proximity to the goods, but need not."

*Id.* at 732.[6] In *Parent* our court upheld a conviction based upon the constructive possession of stolen property. The court specifically distinguished *United States v. Nitti*, where dominion and control were found not to have existed, since in that case "the court specifically noted that '[t]here [was] not a scintilla of proof that defendant ... touched or saw or had any knowledge of the stolen property ....' " *United States v. Parent*, 484 F.2d at 733 (*quoting United States v. Nitti*, 444 F.2d at 1059). Like-

---

5. We do not pass on the question of whether the doctrine of collateral estoppel or any other rule of law bars this court from considering evidence presented relating to the dates on which she was charged and acquitted of possession in our determination of the sufficiency of the evidence to sustain the conspiracy conviction. We need not reach this issue since there is no indication in the record that the trial court considered this evidence, and additionally, we hold the remaining evidence is more than sufficient to support the conspiracy conviction.

6. In her brief, the defendant fails to attribute the language from *United States v. Nitti* and *United States v. Wainer* and contained in the preceding quote to those cases.

wise, *United States v. Wainer,* 170 F.2d 603 (7th Cir.1948), fails to support her argument since in that case our court refused to uphold a conviction for receipt and possession of stolen goods because there was "not a scintilla of evidence that the appellant had anything to do with the receiving, storing, possessing, handling, or disposing of any of the [stolen merchandise]." *Id.* at 605. It is clear from our examination of the record that Barbara Waldo had sufficient "dominion and control" over the jewelry on December 15, 1981, in that she: (1) sat at the table during the negotiations; (2) handled jewelry she now admits she knew was stolen; (3) counted the stolen items about to be sold; (4) commented on the quality of the stolen jewelry; (5) suggested that Mrs. Ronzone would gain a "ten-fold return" on the jewelry; and (6) told Mrs. Ronzone that she could have a 30-day money-back guarantee. We hold that there is substantial and convincing evidence in the record to support a finding that Barbara Waldo was guilty of possessing stolen jewelry on December 15, 1981 beyond a reasonable doubt.

### IV.

Our review of the record reveals that one underlying thread of conspiracy existed between the defendants-appellants George Green and Barbara Waldo, and the other conspirators (Robert Tuohey, Marilyn Tuohey, and Jerry Waldo) to receive, possess, and sell the jewelry stolen from the United Airlines Baggage Facility at O'Hare Field. The evidence clearly points to the conclusion that George Green and Barbara Waldo each knowingly played an active role in the conspiracy to receive, possess and sell the stolen jewelry, and further establishes Barbara Waldo's possession of stolen jewelry on December 15, 1981.

We AFFIRM.