UNITED STATES of America

v.

George D. GATES, Appellant.

UNITED STATES of America

v.

Daniel L. LAMPKINS, Appellant.

Nos. 85–5225, 85–5227.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 8, 1986.
Decided Dec. 30, 1986.

Lois R. Goodman, Atlanta, Ga., (Appointed by this Court) for appellant, Gates, in No. 85–5225.

Ellen Pearlman, with whom Steven H. Goldblatt, Washington, D.C., (Appointed by this Court) was on the brief for appellant, Lampkins, in No. 85–5227.

Clemon W. Williams, Asst. U.S. Atty., for appellee. Joseph E. diGenova, U.S.

Atty., Miachel W. Farrell, William J. O'Malley, Jr., and Ann K.H. Simon, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee in Nos. 85–5225 and 85–5227.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and LEIGHTON,* Senior District Judge.

Opinion for the Court filed by Senior District Judge LEIGHTON.

LEIGHTON, Senior District Judge:

## I

Appellants George D. Gates and Daniel L. Lampkins were jointly charged with four crimes against the federal narcotic laws, all arising from the discovery of a chemical laboratory in which phencyclidine ("PCP") was manufactured. A jury found them guilty on all counts of the indictment; and because Gates had a prior federal drug conviction, and Lampkins had been previously convicted of a state drug charge, the district court sentenced them to enhanced terms in custody of the Attorney General.

In these appeals, the principal issue is whether the district court erred in denying appellants' motions for acquittal and their alternative motion for a new trial. In addition, Lampkins contends that because his prior drug conviction was the result of a prosecution in the State of Maryland, the district court erred in relying on it to enhance his sentence. In this regard, he asks us to strike the illegal portions of the sentences. The government agrees that the enhanced portions of the sentences are illegal and must be vacated; but it disagrees that the illegal portions of the sentences should be stricken. Rather, the government argues, the appropriate relief from the district court's error is affirmance of Lampkins' convictions and remand to the trial court for resentencing. We will first resolve the issue concerning denials of the motions for acquittal and for a new trial; and then, we will settle the dispute concerning the appropriate relief from the illegal portions of the sentences imposed on Lampkins by the district court.

## II

In November 1983, Lampkins and an unindicted coconspirator, Gary Jordan, applied to lease an apartment in Halley Garden in the southeast section of the District of Columbia. Thereafter, Lampkins returned on three occasions to inquire about the application. On December 1, he executed a lease in the name of Gary Jordan for Apartment 2 in the four-apartment building, and paid the remainder of the deposit. The apartment was newly painted and empty of furnishings.

Early in the afternoon of December 3, 1983, Aaron Dunmore, occupant of an apartment above, heard a loud explosion in Apartment 2; it shook the room in which Dunmore was sitting. He looked out his front window. As he did, he heard a crash below, and saw two black men going through a broken window of Apartment 2, one after the other. The first man appeared to be "very bad[ly] charred," the other was helping him. Both men ran in the direction of Dunmore's right, and out of his line of sight. By this time, Dunmore's apartment was filling with smoke and he was forced out of it.

Dunmore went across the hall to warn his neighbor, Maxine Collins, that there was a fire below. On the way, he saw flames coming out the corridor door of Apartment 2. Ms. Collins also heard an explosion from where she was in the kitchen of her apartment and, upon reaching her front window, saw a black man running away from the building, also to her right. Collins had only a brief glance of the man because by the time she saw him, Dunmore was banging on her door. She and Dunmore fled from the building and after seeing fire in Apartment 2, Collins called the District of Columbia fire department whose

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

personnel arrived five to fifteen minutes later.

Among them was fire department Lt. Jimmie H. Johnson, who found heavy smoke and two or three small fires in Apartment 2. One of two living room windows was completely broken out; and when the smoke cleared, Johnson saw a pile of green plant material on the floor, some buckets, money stacked in small piles, numerous soft drink bottles in the kitchen, but no furniture. Shortly thereafter, responding to a radio broadcast received at 3:35 p.m., metropolitan police officer Sherwin Bigelow also arrived on the scene. He recognized the plant substance seen by Johnson as parsley; and, in addition to seeing the money, buckets, and bottles, and the shattered front window observed by Johnson, he also saw several measuring scales and cannisters. His suspicions aroused, he summoned several detectives, a member of the bomb disposal unit, and a crime scene search officer.

On entering the apartment, detective Leslie Ray Brett, an expert in the manufacture and distribution of PCP, found a closet full of chemicals used in its manufacture. He also found a melted white plastic bucket in the living room containing a residue having the odor of PCP. Brett's identification of this drug was later confirmed by chemical analysis. Based on these findings, he concluded that the apartment had been used for the manufacture of PCP. His conclusion was supported by other findings which included discovery of green-glass soda bottles in the kitchen, typically used to contain and disguise liquid PCP, and the presence of large quantities of parsley in the apartment, one of the most popular media in which PCP was sold in the District of Columbia area. It was Brett's opinion, to which he later testified, that one gram of parsley treated with PCP constituted a dosage that was ordinarily sold on the streets for $10 to $15.

On entering Apartment 2, special operative James Powell of the bomb squad concerned himself primarily with the quantity of chemicals. He is a qualified expert in explosives, incendiary devices, and bomb scene investigation, and was attracted by the discovery of seven containers of phenylmagnesium bromide and two of benzine. Both chemicals are highly flammable and have very low "flashpoints." In addition, phenylmagnesium bromide is suspended in ether and is very volatile. Two of the containers of phenylmagnesium bromide were open when he discovered them, and the ether in them had evaporated. Later, these containers were sent to a laboratory for analysis which confirmed that each contained the inorganic components of phenylmagnesium bromide. The remaining five containers, in addition to two of benzine, were destroyed by countercharge explosion.

Powell determined that it was the explosion and fire in Apartment 2 that had melted the white bucket. He further determined that the explosion which precipitated the fire had been caused by combustion of ether in the bucket, either spontaneously ignited there or by ignition of fumes with "flashback" to the bucket. Powell's opinions were based, among other grounds, on the pattern of damage to the apartment's walls, windows, and fixtures, which suggested that a tremendous but brief release of thermal energy had occurred, resulting in an unusual fire that burned along the floor where vaporized ether would be found.

Detective Eugene Couser also examined Apartment 2 in great detail. He noticed its burned condition, the absence of any furniture except a card table in the kitchen, the broken-out front window, the parsley, white buckets, and piles of money in the living and dining rooms. In addition, he found two coats, one blue and one brown. The brown one contained $1,600. The apartment also contained: (1) some keys, one of which fit the door of a locked van that was parked in front of the apartment building, and registered in the name of Daniel L. Lampkins; and (2) a wallet that had in it a District of Columbia driver's license in the name of George D. Gates. Couser also found a quantity of plastic

lock-seal containers, a number of trash bags, a heat sealer, a gas mask, a quantity of nuisance (dust) masks, burnt cans, parsley containers, and parsley scattered all over the kitchen and living room floors, as well as a funnel, spoons, rubber gloves, and a scale. In a rear closet of the apartment, he found the large quantity of hazardous chemicals that had been discovered and identified by Lt. Powell.

When they arrived at Apartment 2, Det. Carl A. Gatewood and crime scene officer James W. Robinson found on the grass, and on glass fragments outside the broken-out front window, a red substance later identified as human blood. It formed a trail which Gatewood followed leading from the front of the building off to the right, then down the street to an alley, and into the unit block of Elmira Street, where the trail ended. This discovery was made at approximately 3:30 to 3:45 in the afternoon; and at about that time, Mary B. Hobbs, a long-time friend of appellant Gates, received a telephone call while she was at work as a psychiatric technician in St. Elizabeth's Hospital. The caller identified himself as a friend of Gates and told her Gates had been in an accident and wanted her to meet him at her home. When she arrived five to seven minutes later, Lampkins (then a stranger to her) approached Hobbs and asked her to get something in which to wrap Gates, who was sitting in the back of an automobile driven by another black man. Hobbs saw immediately that Gates was badly burned; but it was not until Lampkins had carried Gates into her apartment that she realized the seriousness of his condition. She immediately called an ambulance. Before it arrived, Gates told her that he had been burned in a gasoline fire while helping a friend clean his car engine. No record exists, maintained by either law enforcement agents in Prince Georges County, Maryland, or the District of Columbia, reporting or describing any gasoline or automobile fire involving Gates. When the ambulances arrived, a paramedic administered oxygen to Gates and called the Prince Georges County medic helicopter to evacuate him by air to the Washington Burn Center. Gates had second and third-degree burns on his face, arms, legs, and shoulders. Although Gates also told the helicopter paramedic that he had been involved in a car explosion, neither Hobbs nor the helicopter paramedic recalled smelling gasoline on him.

The presence of the various chemicals in Apartment 2 on December 3, 1983, and the explosion and fire, have significance for those who know the manufacture of PCP, a process that involves two steps. The first one requires a mixing of two separate solutions: piperidine with either sodium or potassium cyanide, and cyclohexanone with sodium bisulfate. These two mixtures are then combined in a water medium in a five-gallon pail or other similar container, stirred, and permitted to interact over a period between 10 and 12 hours to create piperidinocyclohexanecarbonitrile ("PCC"), an intermediate crystal. This crystal must then be dried thoroughly because any remaining moisture on it will present a deadly hazard in step two, which takes place in a chemical solvent rather than in a water medium. Benzine is such a solvent. The dry PCC crystals are placed in a bucket containing the chemical solvent and a grignard reagent such as phenylmagnesium bromide suspended in ether is poured into the bucket. PCP forms immediately, and will remain as a residue after the ether and chemical solvent evaporate.

The very great danger in manufacturing PCP is igniting the ether. If any water comes in contact with the phenylmagnesium bromide (e.g., if the PCC crystals are not completely dry prior to initiating the second step), a very violent chemical reaction may take place giving off significant heat. The heat will vaporize the ether present in the bucket and may ignite it. If phenylmagnesium bromide suspended in ether is poured rapidly onto wet PCC crystals, for example, an explosion may result. Alternatively, a spark anywhere in a room where ether vapor is present is sufficient to ignite the ether and cause a "flashback" to its principal source.

The residue found in several containers in Apartment 2 were tested by a Drug Enforcement Administration chemist and his principal findings were as follows: (1) the partially melted white bucket that one prosecution witness identified as the point of origin of the explosion and fire, contained PCP and piperidine in a mixture including the equivalent of 439 grams of pure PCP; (2) the Pyrex measuring cup contained PCP, piperidine, and a magnesium compound; (3) two plastic funnels contained PCP and piperidine; (4) a small metal measuring cup contained PCP, piperidine, as well as a magnesium compound; and (5) another bucket contained 2.6 grams of pure PCP and residues of magnesium and bromide. The chemist confirmed that the condition of the partially melted white bucket was consistent with its use for the manufacture of PCP during which a fire had occurred. It was also his opinion that a street dosage of PCP consisted of five milligrams, and that there was a sufficient quantity of piperidine in Apartment 2 to make 1.8 million street dosages.

Appellant Gates, who suffered from burns on December 3, 1983, and who had been under medical treatment, was ordered by the district court on September 21, 1984 to undergo an examination by Dr. William Brownlee, a licensed physician and surgeon, and an expert in the fields of medicine, surgery, and forensic pathology. This was in order to enable Dr. Brownlee to give testimony on behalf of the government concerning the nature and circumstances under which Gates suffered the burns. The examination was originally set for October 31, 1984, but because Dr. Brownlee was not available, and Gates was absent from the city, the examination did not take place. On January 2, 1985, after the jury was impaneled, counsel for the government called the court's attention to this fact. After some discussion, Gates was ordered to appear at the medical unit of the courthouse the next day at 9:00 a.m. and be examined. Gates and his counsel agreed, it was done, and Dr. Brownlee observed the location and intensity of the burns on Gates' body.

From his observation, Dr. Brownlee formed the opinion that the heat source which had burned Gates was symmetrically in front of him. His shoulders, knees and hands, according to Dr. Brownlee, had been about equi-distant from the heat source, with his right hand slightly closer than the left. Gates' arms had been flexed at about a 90° angle, and the heat source was below his head and hand levels and slightly below his knee level. At the time he was burned, according to Dr. Brownlee, Gates had his chin tucked into his chest so that his face was directed straight toward the heat source. All of Gates' burns, in Dr. Brownlee's opinion, occurred at the same moment. He concluded that an ether fire would produce the pattern of burns he saw on Gates; but that a gasoline fire would not.

Neither appellant testified at the trial. Gates' defense evidence consisted of a stipulation which acknowledged that the police had recovered four latent fingerprints from the apartment, and none belonged to him or Lampkins. Lampkins called Det. Couser as his only witness; and he testified that on December 3, 1985, after unlocking the doors of the van registered to Lampkins, he found three boxes inside but did not remove them or start the van's motor. Couser said that the van subsequently was removed by a crane to a police lot.

### III

On these facts, and as charged in the four-count indictment, the jury found appellants guilty of conspiracy to manufacture and distribute phencyclidine, a Schedule II controlled substance (Count One); intentional manufacture of phencyclidine (Count Two); possession with intent to distribute phencyclidine (Count Three); and possession of piperidine, with intent to manufacture phencyclidine (Count Four), all within the District of Columbia and in violation of applicable provisions of 21 U.S.C. § 841 *et seq.* Appellants, in written and oral submissions, argue that the evidence which the jury heard was insufficient to support any finding of conspiracy, any

finding that they intentionally manufactured phencyclidine, any finding that they possessed it with intent to distribute; or any finding that they possessed piperidine with intent to manufacture phencyclidine, all of which, according to the government's theory, occurred in Apartment 2, 4307 First Street, S.E., in the District of Columbia, on or about the afternoon of December 3, 1983.

Appellants go further; they insist that the evidence before the jury did not tie either of them to the apartment, or establish their presence in it during the times relevant to the chemical laboratory found by the police. Therefore, they contend that the district judge erred in not granting their motions for acquittal on all counts of the indictment. In the alternative, appellant Gates argues that his motion for a new trial should have been granted, a motion in which Lampkins joined. Additionally, Gates contends it was plain error for the district judge to permit a prosecution doctor to examine him after the jury had been selected and without time for the doctor to write a report, or for Gates' attorney to obtain other medical opinions. We have carefully considered each point urged on us by appellants; but impelled by controlling principles of law, we are constrained to disagree.

## IV

■ It is true, as appellants point out, that the government's evidence of the alleged conspiracy, and of the three substantive offenses, is almost entirely circumstantial. However, "circumstantial evidence plays a substantial role in conspiracy trials because of its relevance in establishing conspiracies and the genuine inability to obtain direct evidence of the conspiratorial agreement." *United States v. Roman,* 728 F.2d 846, 858 (7th Cir), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984); *see also United States v. Green,* 735 F.2d 1018, 1023 (7th Cir.1984). As a general rule, circumstantial evidence is as pertinent as direct evidence to the establishment of guilt or innocence in a criminal case. *Unit-*

*ed States v. Clark,* 776 F.2d 623, 627 (7th Cir.1984); *see United States v. Cogwell,* 486 F.2d 823, 828 (7th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1975, 40 L.Ed.2d 310 (1974). As the Supreme Court has observed, "[d]irect evidence of a fact is not required. Circumstantial evidence is not only sufficient, but also may be more certain, satisfying and persuasive than direct evidence." *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330, 81 S.Ct. 6, 11, 5 L.Ed.2d 20 (1960). Accordingly, this court has held that possession of controlled substances with intent to distribute may be established by circumstantial as well as direct evidence. *United States v. Staten,* 581 F.2d 878, 883 (D.C.Cir.1978); *United States v. Bethea,* 442 F.2d 790, 793 (D.C. Cir.1971).

■ In this case, evidence of a conspiracy to manufacture and distribute phencyclidine from the apartment in question was strong and persuasive. The presence of drug-manufacturing equipment and paraphernalia, substantial quantities of the requisite chemicals, large sums of money, and profit-making quantities of PCP that could only have been the product of concerted activity within the apartment, all pointed to the existence of an ongoing conspiracy.

■ There was also persuasive evidence that at least two of the conspirators were appellants. The jury was entitled to conclude beyond a reasonable doubt that the two black men whom Owen Dunmore saw leaving the apartment through a broken window after the explosion, one of them "very bad[ly] charred," were appellants because a short time later they were seen by Mary B. Hobbs who observed that Gates was in a badly charred condition suffering from burns. An expert medical witness for the government described to the jury how he examined Gates and concluded that an ether fire from the chemical explosion in the apartment would have caused the kind of burns he saw on Gates; but that a gasoline fire, such as Gates claimed he had been through, would not have done so.

There was also the evidence of the wallet and keys found in the apartment. The

wallet contained identification papers of appellant Gates, and one of the keys belonged to a van parked nearby and registered to appellant Lampkins. This was important evidence that not only linked appellants to the apartment in question but also indicated that they were there manufacturing PCP, possessed it with intent to distribute, and possessed piperidine with intent to manufacture phencyclidine. Therefore, from the evidence presented to it, and the inference it could have drawn therefrom, it was rational for the jury to have concluded that the guilt of appellants was established beyond a reasonable doubt as to each count of the indictment. *See United States v. Weisz,* 718 F.2d 413, 437–38 (D.C.Cir.1983), cert. denied, 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984); *United States v. Reese,* 561 F.2d 894, 898 (D.C.Cir.1977); cf. *United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir.1983); *United States v. Lewis,* 626 F.2d 940, 951 (D.C.Cir.1980). For this reason, the district judge did not err in denying appellants' motions for acquittal, nor in denying their motion for a new trial. *United States v. Staten,* 581 F.2d 878, 882–83 (D.C.Cir.1978); *United States v. Davis,* 562 F.2d 681, 693 (D.C.Cir.1977). It has long been the rule in this circuit that we will not disturb denial of an appellant's motion for acquittal in the absence of abuse of the trial court's discretion. *Battle v. United States,* 206 F.2d 440, 441–42 (D.C.Cir.1953).

■ Nor did the district court commit plain error as to appellant Gates when it ordered him to submit to a medical examination by a government expert the day after the jury was selected and sworn. Gates concedes that normally the conduct of a criminal trial is within the district court's discretion but he argues that in this case the discretion was abused by the last-minute physical examination of him without the doctor being given the opportunity to write a report, or to permit Gates to obtain his own expert. We cannot agree. On October 5, 1984, after hearing the parties, the district court ordered Gates "to undergo a physical examination by a qualified physician to determine the nature, ex-

tent, and origin of the burns the defendant suffered on or about December 3, 1983...." For a number of reasons, including Gates' inability to comply, the examination was not completed. When after the jury had been selected this fact was called to the district judge's attention, she ordered Gates to submit to the examination on the following day in the health unit within the federal building. Without expressing any further objection, Gates complied and was examined. When the government expert testified, Gates did not object; his lawyer did not request a continuance or an opportunity to obtain an additional medical opinion. Clearly, the district judge had the power to order the examination, *see United States v. Crowder,* 543 F.2d 312 (D.C.Cir.1976), cert. denied, 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977); cf. *United States v. Erwin,* 625 F.2d 838 (9th Cir.1980); and even more clearly, no fundamental right of appellant was violated by the order. *See United States v. Dionisio,* 410 U.S. 1, 11, 93 S.Ct. 764, 770, 35 L.Ed.2d 67 (1973); cf. *Holt v. United States,* 218 U.S. 245, 253, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910).

## V

■ With regard to the sentences imposed on appellant Lampkins, the government agrees that the district judge erred in relying on a Maryland drug conviction to enhance the sentences and the special parole terms. With commendable candor, it now concedes that all the enhancements, 10 years to the maximum of 20, and the 2–year special parole terms to 4 years, are illegal. This is obvious. The maximum prison term for each offense under 21 U.S.C. §§ 841 and 846 was 10 years, with special parole of not less than 2 years. The enhancement provision of § 841(b)(5) applied:

If any person commits such a violation after one or more prior convictions of him for an offense *punishable under paragraph (1) of this paragraph, or for a felony under any other provision of this subchapter or Subchapter II of this*

*chapter or other law of the United States relating narcotic drugs,* marijuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 20 years, a fine of not more than $50,000, or both.... (emphasis added)

The language of the statute, its legislative history and case law construing it, clearly established that these enhancement provisions applied only where a defendant had a prior drug conviction under ch. 13 of Title 21, United States Code, or under some other federal law. *See* Joint House-Senate Explanation of Senate Amendment, 95th Cong., 2d Sess. 124 Cong. Rec. 36947 (1978); Comprehensive Drug Abuse Prevention and Control Act of 1970, H.Rep. No. 91–1444, 91st Cong., 2d Sess., 47, *reprinted in* 1970 U.S.Code Cong. & Admin. News 4566, 4614; *United States v. Johnson,* 506 F.2d 305, 307 (7th Cir.1974), *cert. denied,* 420 U.S. 1005, 95 S.Ct. 1448, 43 L.Ed.2d 763 (1975); *United States v. Gaertner,* 705 F.2d 210, 218, n. 2 (7th Cir. 1983), *cert. denied,* 464 U.S. 1071, 104 S.Ct. 979, 79 L.Ed.2d 216 (1984).

Despite this fact, an Assistant United States Attorney on December 19, 1984, filed a notice of additional penalties pursuant to 21 U.S.C. § 851, informing the court "that the defendant in this case, Daniel Lampkins, was convicted in Maryland in Prince Georges County Circuit Court, of the offense of possession with intent to distribute a controlled dangerous substance on or about June 20, 1984." Plainly, the attorney for the government was mistaken; the Maryland drug conviction could not legally form the basis for additional penalties on the charges pending against appellant.

Nonetheless, on the day trial began, a copy of the notice was served on Lampkins, and his lawyer acknowledged the previous state drug conviction but said that he did not "concede or waive any opportunity to contest the applicability of the statute." The lawyer did not say what statute he had in mind or what kind of contest he intended to undertake. At Lampkins' sentencing hearing on February 22, 1985, he was represented by the same lawyer; the government was represented by the same Assistant United States Attorney ·who had filed and served the notice of additional penalties. To add to the confusion, the probation department, apparently led into the same erroneous construction of the statute, told the district judge that under § 841, the sentences to be imposed on Lampkins could be enhanced and he could be sentenced to a maximum of 20 years on the first three counts of the indictment, with a $50,000 fine; and on the last count, to a maximum of 10 years and a $30,000 fine. The special parole terms, the district judge was told, could be a minimum of 4 years. Neither Lampkins' lawyer nor the Assistant United States Attorney corrected this erroneous construction of the sentencing statute; nor did either of them call the district judge's attention to the fact that Lampkins' state conviction could not be used to invoke the double penalty provisions of § 841(b)(5). Of course, we all know that at a sentencing hearing the district judge need not expressly consider a matter which neither the defendant nor the lawyer for the government brings to his or her attention. *See United States v. House,* 808 F.2d 508, 510 (7th Cir.1986).

The sentencing hearing proceeded through the stages of allocution and the district judge, after referring to the enhancement provisions, sentenced Lampkins to concurrent maximum imprisonment of 20 years, and special parole terms of 4 years. Lampkins argues that since the enhanced portions are illegal, we should strike them and sentence him in this court to maximum concurrent terms of 10 years on the first three counts of the indictment, and a concurrent maximum term of 5 years on the fourth count, with concurrent minimum special parole terms of 2 years. We cannot agree with this argument. Although we have the authority to strike illegal portions of a sentence, *United States v. Magliano,* 336 F.2d 817, 823 (4th Cir.1964), we will not do so in this appeal.

In our judgment, the district judge, who presided over appellant's trial, heard the evidence with the jury, and had the benefit of a presentence report, should have the opportunity to sentence appellant without the impediment of an erroneous request by the government for the imposition of additional penalties. In so deciding, we rely on the principle that generally the sentencing of an accused is within the authority of no one but the trial judge. *Walters v. Harris,* 460 F.2d 988, 992 (4th Cir.1972), *cert denied sub nom. Wren v. United States,* 409 U.S. 1129, 93 S.Ct. 947, 35 L.Ed.2d 262 (1973); *Marano v. United States,* 374 F.2d 583, 586 (1st Cir.1967). However, the resentencing of appellant is not intended by us to be an opportunity for the government to obtain, either by consecutive sentences or other sentencing device, the same sentence which it concedes is in substantial part illegal. We are confident that on remand the district judge in this case will afford the parties a hearing and fashion a sentence or sentences consistent with sentencing considerations that are well known and commonly understood. *See* 3 C. Wright, *Federal Practice and Procedure: Criminal 2d,* § 526 (2d ed. 1982).

## VI

Therefore, as to appellant Gates, we affirm his convictions in their entirety. As to appellant Lampkins, we affirm his convictions, vacate the sentences and remand to the district court for resentencing within the range permitted for a conviction under 21 U.S.C. §§ 841(a)(1) and 846, without regard to the Maryland conviction. *Williams v. United States,* 651 F.2d 648,

651 (9th Cir.1981); *United States v. Allen,* 566 F.2d 1193, 1196 (3d Cir.1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1491, 55 L.Ed.2d 519 (1978); *cf. Davenport v. United States,* 353 F.2d 882, 885 (D.C.Cir.1965).

## VII

We now add a few words of appreciation for the lawyers who have represented appellants in these appeals. We appointed Lois R. Goodman, Esq. to represent Mr. George D. Gates in this court. We also appointed Ellen Pearlman, Esq. and Steven H. Goldblatt, Esq. to represent Mr. Daniel Lampkins before us. Mr. Goldblatt is the Director of the Appellate Litigation Clinical Program at the Georgetown University Law Center. As a consequence, there appeared with him on the brief, and at oral argument, fellows and students of the program. To Ms. Goodman, Ms. Pearlman, Mr. Goldblatt, and his colleagues, we express our appreciation. Each has represented the appellant for whom they were appointed in a manner consistent with the finest traditions of the legal profession. The quality of their work has enabled us to discharge our responsibilities in these appeals, which have proceeded *in forma pauperis.*

*It is so ordered.*