UNITED STATES of America,
Plaintiff-Appellee,

v.

Carlos Mario RAMIREZ and Doris Cordoba, Defendants-Appellants.

Nos. 85–2090, 85–2261.

United States Court of Appeals,
Seventh Circuit.

Argued April 16, 1986.
Decided July 14, 1986.

Gwendolyn D. Anderson, Anderson & Associates, Chicago, Ill., for defendants-appellants.

Stephen Heinze, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and COFFEY, Circuit Judges, and NOLAND, District Judge.*

NOLAND, District Judge.

The defendants were convicted of conspiring to possess cocaine with an intent to distribute, 21 U.S.C. § 846 (1982),[1] and the use of a "communciation facility"—a telephone—in furtherance of that conspiracy, 21 U.S.C. § 843(b) (1982).[2] The primary questions raised by the defendants-appellants in this appeal are (1) whether the evidence at trial was sufficient to convict Ramirez of the named offenses, (2) wheth-

er the evidence established a single conspiracy or multiple conspiracies, and (3) whether the trial court impermissibly extended the scope of a federal agent's testimony. On appeal Ramirez raises all of these issues, while Cordoba raises only the third. For the reasons stated below, we affirm the jury's verdicts.

### I. Factual Background

In November of 1983, while the FBI was conducting an undercover investigation unrelated to narcotics, certain undercover FBI agents became aware of a potential drug trafficking ring. The agents met with, and conducted drug transactions with, Edgar and Miriryam Cordoba. In the course of these meetings, Edgar stated that rather than using actual drug names during a transaction, code names such as "tires" or "books" were employed as a precaution. In addition, in order to facilitate the drug transactions, Edgar and Miriyam gave the agents their home telephone number.

In July of 1984, the FBI conducted an electronic surveillance of the Cordobas' home phone, and the government introduced the following four phone conversations against Ramirez at trial:

July 9, 1984: Ramirez telephones collect from Miami, Florida and speaks to Edgar Cordoba, Elmer Velasquez and Henry Cordoba. He asks them to wire him $1,000, tells them he has "apparatus" and wants to negotiate. Velasquez offers to pay "$32" and Ramirez responds that they are "beautiful 95% tires." Further reference was made to

---

* The Honorable James E. Noland, Chief District Judge for the Southern District of Indiana, is sitting by designation.

1. Section 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

2. Section 843 in pertinent part provides:
   (b) It shall be unlawful for any person knowingly or intentionally to use any commu-

nication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter. Each separate use of a communication facility shall be a separate offense under this subsection. For purposes of this subsection, the term "communication facility" means any and all public and private instrumentalities used or useful in the transmission of writing, signs, signals, pictures, or sounds of all kinds and includes mail, telephone, wire, radio, and all other means of communication.

negotiate "that stuff" and arrangements were made to pick Ramirez up at the airport. Ramirez inquires about "Flacko" and is told that Flacko is "working very hard ... he's pushing faster."

July 12, 1984: Ramirez telephones Miriryam Cordoba. They make arrangements to meet and Cordoba asks Ramirez about his "female cousins." Ramirez in turn asks Cordoba whether she "needs some of" his cousins and whether she needs "a little or what." Cordoba answers yes to both queries.

July 15, 1984: Ramirez calls a "Mike" from the Cordoba phone and discusses a transaction involving the exchange of "music," "long plays," and the "Perico." Ramirez repeatedly asks Mike if he "understands" and Mike responds affirmatively. Mike tells Ramirez that "many people have been waiting for one LP ... since yesterday."

July 18, 1984: Ramirez calls Miriryam Cordoba collect from "down here ... in the orange grove."

Other evidence introduced against Ramirez consisted of a signed invoice from Liberty Volkswagen, a traffic citation, a Texaco credit card application and photos taken of Ramirez in the bedroom of Velasquez, all of which were found in a search of Velasquez's bedroom. Other phone conversations closely proximate to the July 9th conversation apparently dealt with the sale of the same merchandise—described as "books," "undershirts" and "stuff".

At trial, the government's principal witness regarding the interpretation of the telephone conversations was FBI agent Larry Damron, who was one of the undercover agents during the investigation. Damron testified that (a) he had 13 years with the FBI as a special agent, (b) that he had handled 100+ narcotics cases, (c) that he was trained at the FBI academy, (d) that he investigated drug cases in 1977, (e) that he had had a special two hour course on drug code words, (f) that he had read periodicals and had discussions with other agents, but (g) that he was unable to point

to a glossary, article, or manual as a source of his knowledge. The defense challenged the "expert" status of Damron after *voir dire*. Although his ruling lacked lucidity, the trial judge ruled that even though he would not "label" Damron an "expert" to the jury, Damron would be allowed to testify as an expert under the Federal Rules of Evidence. The trial judge explained that he was relectant to label Damron an expert to the jury as it was his perception that such a label confused juries. The trial judge gave the jury the stock Seventh Circuit instruction on expert witnesses, but he omitted the word "expert" from the instruction. All of the attorneys had previously agreed to the instruction. After giving the instructions, the trial judge asked each of the attorneys for the defendants and the government whether any of the instructions were objectionable and no objections were made.

## II. *Discussion*

### A. *Sufficiency of the Evidence*

Ramirez concedes, as he must, that sufficient evidence of the Cordoba drug trafficking conspiracy existed. Ramirez does argue, however, that the evidence was not sufficient to prove (a) that he had knowledge of the conspiracy, (b) that he had an agreement to further the objectives of the conspiracy, or (c) that he participated in the conspiracy. In addition, Ramirez argues that he was involved in only one isolated transaction, and that the evidence was insufficient to prove that this transaction involved cocaine.

■ Ramirez must shoulder a heavy burden to obtain a reversal on the "sufficiency" issue. An appellate court must uphold a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis original); *see United States v. Percival*, 756 F.2d 600, 610 (7th Cir.1985). An appellate court will not weigh the evidence or assess the credibility of the witnesses. *United*

*States v. Wilson*, 715 F.2d 1164, 1173 (7th Cir.), *cert. denied sub nom. Williams v. United States*, 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366 (1983). " 'Only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' " *United States v. Peters*, 791 F.2d 1270 (7th Cir.1986) (quoting *Brandom v. United States*, 431 F.2d 1391, 1400 (7th Cir.1970), *cert. denied sub nom. Gilboy v. United States*, 400 U.S. 1022, 91 S.Ct. 586, 27 L.Ed.2d 634 (1971)). Finally, once a conspiracy is established, only a slight amount of additional evidence is necessary to convict a particular defendant of participating in the conspiracy. *United States v. Green*, 735 F.2d 1018, 1023 (7th Cir.1984).

■ As noted above, the existence of a drug trafficking conspiracy between Edgar Cordoba and others is irrefutable. In addition, the evidence introduced at trial showed that Ramirez made four telephone calls either to or from the Cordobas' home telephone within a ten day period. Some of the telephone calls were placed from outside of Illinois, and he had the charges reversed. He spoke with at least four different members of the conspiracy, and the conversations themselves obviously involved some kind of code language. Witnesses at the trial explained that the nonsensical language employed by the conversants was a code for illegal drugs, and that the discussions focused on drug negotiations or travel arrangements to facilitate the same.

In addition, the evidence established that he had a close personal relationship with one of the conspirators—Velasquez—that he traveled to Florida—a known point of entry for illegal drugs—twice during a ten day period while staying in close contact with the Cordobas, and that his friend in-

formed him upon inquiry that "Flacko" was "pushing faster." A witness for the government testified that this latter comment pertained to the activities of Edgar Cordoba. The numerosity and detail of Ramirez's conversations, as well as his unusual travel agenda, connections with one of the primary conspirators, and the testimony of the agents, constitute sufficient evidence under the *Jackson v. Virginia* standard to establish that Ramirez knowingly participated in a conspiracy to distribute cocaine. In addition, these same considerations establish that Ramirez's participation was neither innocuous nor isolated.[3]

### B. *Single or Multiple Conspiracies*

■ Ramirez also contends that the evidence adduced at trial was not sufficient to establish that only a single conspiracy existed. A single conspiracy is established if the conspirators "[b]y their separate agreements ... they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal." *Blumenthal v. United States*, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947). The controlling standard adopted by this Circuit states:

> Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy.

*United States v. Percival*, 756 F.2d 600, 607 (7th Cir.1985) (quoting *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir.1969)).

In this case, there was sufficient evidence of knowledge, assistance and mutual

---

**3.** Having concluded that Ramirez was a knowing participant in the conspiracy, Ramirez's *Santiago* argument must also fail. *See United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978). Ramirez contends that because he was not a member of the conspiracy, the statements of the conspirators were not admissible against him.

First, because the evidence was sufficient to implicate him in the conspiracy, the admission of the conspirators' statements did not run afoul of *Santiago*. Secondly, it was Ramirez's own statements that convicted him, not those of his co-conspirators.

reliance between Ramirez and the other conspirators, for the jury to find a single conspiracy to distribute cocaine. Ramirez had conversations with four of the core conspirators and one unidentified person regarding the distribution of cocaine. All of these conversations took place during telephone calls that were made to or from the home of the alleged "kingpin" of the conspiracy, Edgar Cordoba. In addition, Ramirez was told that Edgar Cordoba was actively "pushing" the drugs "faster" than he had previously. Moreover, the intercepted conversations reveal that Ramirez phoned the Cordobas collect from Miami, Florida to discuss drugs, and relied on the Cordobas to fund and facilitate his drug excursions. Based on these findings, there was sufficient evidence for the jury to conclude that Ramirez was working with the other conspirators to distribute cocaine, and that he was aware that this group was in the business of accomplishing the same.[4]

### C. "Expert" Witness

■ Both Cordoba and Ramirez argue that the trial judge's rulings involving agent Damron as a witness constitute reversible error. Both contend that the trial judge ruled Damron was *not* an expert, thus his testimony regarding drug "code" words was impermissible. Although there appeared to be some confusion on this issue at trial, a close reading of the trial transcript establishes that the trial judge ruled Damron was an expert pursuant to the Federal Rules of Evidence. The trial judge, in order to prevent the jury from placing undue emphasis upon the testimony of agent Damron, refrained from labeling agent Damron an "expert" in the presence of the jury. In keeping with this ruling, the trial judge gave the jury this Circuit's stock instruction regarding expert testimony, but omitted the term "expert" from that instruction. Contrary to the arguments of the attorneys for the defendants, the trial judge's handling of agent Damron's testimony profited rather than prejudiced the defendants. Because agent Damron was never declared an expert before the jury, the jury was never given the opportunity to attach excessive weight to his testimony. As a result, the trial judge's ruling on the matter does not provide a basis for a successful appeal.[5]

■ The defendants-appellants next contend that Damron was not qualified to testify as an expert. The defendants-appellants confront a heavy burden on this issue:

> This court has consistently held that the district court has broad discretion to assess the admissibility of expert testimony. *Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226 (7th Cir. 1982); *United States v. West*, 670 F.2d 675 (7th Cir.1982). Under the rule established in *Spray-Rite*, the district court's ruling on the admissibility of expert testimony will not be overturned in the absence of a clear showing of abuse of discretion. *Spray-Rite Service Corp. v. Monsanto Co., supra*, 684 F.2d at 1241.

*Spesco v. General Electric Co.*, 719 F.2d 233, 238 (7th Cir.1983). In this case, based on the qualifications recited in the factual portion of this opinion, the trial judge did not abuse his discretion in treating agent Damron as an expert.

■ Finally, the defendants-appellants argue that although Damron was allowed to testify as an expert on direct examination, the *voir dire* and cross-examination of him was impermissibly constrained. It is well established that "a trial judge has considerable discretion to place restrictions on the scope of cross-examination" of adverse witnesses, including experts. *United*

---

4. Because this Court has concluded that only one conspiracy was established at trial, the statements of all the conspirators were admissible against Ramirez. Fed.R.Evid. 801(d)(2)(E). *See United States v. Santiago*, 582 F.2d 1128 (7th Cir.1978).

5. It is the opinion of this panel that it would have been more appropriate for the trial judge to give the jury this Circuit's stock instruction regarding expert witnesses without omitting the term "expert." Because the trial judge's ruling was not detrimental to the defendants, however, the trial judge's ruling does not constitute reversible error.

*States v. Wisniewski,* 741 F.2d 138, 142 (7th Cir.1984). *See also N.V. Maatschappij Voor Industriele Waarden v. A.O. Smith Corp.,* 590 F.2d 415, 421 (2nd Cir. 1978). In addition, a trial judge's discretion to control the *voir dire* examination of experts is substantial. *See United States v. Winograd,* 656 F.2d 279, 282 (7th Cir. 1981), *cert. denied sub nom. Siegel v. United States,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). This Court having carefully reviewed the record now concludes that the trial judge did not abuse his discretion.

### III. *Conclusion*

For the reasons stated above, the trial jury's convictions of the defendants-appellants on both counts are AFFIRMED.