UNITED STATES of America,
Plaintiff–Appellee,

v.

Bruce A. BENJAMIN, Defendant–
Appellant.

No. 92–2343.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 25, 1993.

Decided June 9, 1993.

Larry Wszalek (argued), Office of the U.S. Atty., Madison, WI, for plaintiff-appellee.

Ralph A. Kalal (argued), Kalal & Habermehl, Madison, WI, for defendant-appellant.

Before CUMMINGS and ROVNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

Bruce Benjamin is a convicted felon who was caught driving drunk with guns visible in the back seat of his car. He asks us to overturn his conviction for possessing firearms as a felon in violation of 18 U.S.C. § 922(g)(1) because authorities garnered the evidence against him from an arrest that violated his Fourth Amendment rights. Because Benjamin's arrest was lawful, we affirm his conviction.

Around 10:30 p.m. on April 28, 1990, while patrolling in his squad car, Deputy Sheriff Glen Gramer of Burnett County, Wisconsin, noticed a small car weaving in and out of its lane. Gramer turned on his lights and siren, intending to follow the car and pull it over, but this turned out to be more work than he expected. The car accelerated towards the border three miles away, with Gramer following at 65 miles per hour—hot pursuit, if not a high-speed chase. After he crossed into Minnesota, Gramer turned off his siren and radioed the local sheriff's department to alert them about a possible drunk driver in their jurisdiction. He testified that he kept tailing the car outside Wisconsin because he feared for the safety of motorists in Minnesota.

Gramer continued to follow the car as it turned north onto a dirt road and wove back and forth across what Gramer called "the imaginary center line." After a few miles, the car careened in and out of a circular driveway and then tumbled down an embankment, coming to rest atop a log at the bottom of a ditch. Gramer parked his squad car about a hundred feet behind the wreck and turned on his spotlight; he got out of his car, but he neither approached nor drew his weapon. One passenger climbed out of the car and ran away; Gramer called "stop!" but did not pursue. When the driver emerged, Gramer recognized him as Bruce Benjamin, an acquaintance from high school. Gramer knew that Benjamin was a convicted felon, and by coincidence he had recently learned that Benjamin's driver's license was suspended.

As Benjamin walked up the embankment, Gramer called him by name and asked him why he had been driving so poorly. Gramer hoped to engage Benjamin in conversation until the Pine County Minnesota deputies arrived, but his efforts yielded only terse exchanges as the two stood on the road under the glare of Gramer's spotlight. Benjamin—coordination impaired, eyes bloodshot, breath alcoholic, spitting as he spoke—gave Gramer the impression he was drunk. A third man wriggled from the wrecked car's window and ran away. As before, Gramer called "stop!" but did not pursue, while Benjamin headed toward the house whose driveway he had circled just before crashing his car. Gramer asked Benjamin to wait, but Benjamin swore at him and kept walking. Gramer moved in front of Benjamin and retreated in his path while continuing to ask him to wait, but he did not touch Benjamin, draw his pistol or threaten him.

What had been merely a tense situation erupted when Benjamin took a roundhouse swing at Gramer and called to a German shepherd near the house, siccing it on Gramer. Gramer dodged the punch; the dog approached, teeth bared and growling, and Benjamin took another swing at Gramer. Perhaps sensing that he was in danger of losing control of the situation, Gramer decided to mace Benjamin and the dog. The dog turned tail, while Benjamin and Gramer collided and fell scuffling onto the gravel roadway as Gramer yelled "knock it off—let's wait for Pine County!" Benjamin got up and walked away, and soon afterwards a posse of Pine County deputies arrived. They examined Benjamin, noted his intoxicated manner, confirmed that he had driven the wrecked car, arrested him for drunk driving and cuffed him in the back of a Pine County squad car.

Benjamin's arrest was but a prelude to more serious woes. A Pine County deputy walked down to check out the ditched auto and hollered, "Hey, there's some guns in here!" Gramer looked through the car window himself, and later testified that several long guns were plainly visible on the wreck's back seat and floor. Deputies towed the car out of the ditch and recovered five stolen rifles and shotguns. Benjamin made several incriminating statements after his arrest; he was charged with possessing as a felon and transporting five stolen firearms in violation of 18 U.S.C. §§ 922(g)(1) and 922(i). He moved to suppress his statements and the guns, arguing that they were the fruits of an unlawful arrest. After a hearing, the court ruled against him and he pled guilty to possessing five firearms as a felon. The trial court dismissed the second count for transporting stolen firearms on the government's motion, and Benjamin was sentenced to fifteen years in prison.

■ Benjamin argues on appeal that Gramer effectively arrested him the moment he climbed out of his wrecked car and that there was no probable cause to arrest him at that time. Absent probable cause, he contends that the guns and post-arrest statements taken by Pine County were the fruits of an unlawful arrest and should have been suppressed as violations of the Fourth Amendment. The district court agreed with the government that Benjamin was not "arrested" under the Fourth Amendment until Gramer maced him. Because their interaction up to that point had been voluntary, the court found, it did not raise any Fourth Amendment issues. The court held that by the time Gramer maced Benjamin, Gramer had probable cause to believe that Benjamin had been driving drunk and had committed assault in Minnesota. We uphold the denial of a motion to suppress unless the district court's decision was clearly erroneous. *United States v. Adebayo*, 985 F.2d 1333, 1337 (7th Cir.1993).

■ First we must decide whether Gramer, a Wisconsin sheriff, had any authority to arrest Benjamin in Minnesota. The district court correctly held that Gramer had the power to arrest Benjamin under Minnesota's private citizen arrest statute, Minn.Stat. § 629.37. Minnesota courts have interpreted this law to allow out-of-state officers to make arrests in Minnesota. *State Department of Public Safety v. Juncewski*, 308 N.W.2d 316, 321 (Minn.1981); *State v. Sellers*, 350 N.W.2d 460, 462 (Minn.App.1984). Since Gramer had ample opportunity to observe Benjamin breaking Minnesota law, we need not decide

whether Gramer could have made a citizen's arrest of Benjamin for offenses he witnessed in Wisconsin. See *Piotrowski v. Commissioner of Public Safety,* 453 N.W.2d 689, 690 (Minn.1990). Minnesota's Fresh Pursuit Act, Minn.Stat. § 626.65, does not apply here because Wisconsin and Minnesota do not grant one another's officers authority to make official arrests after a chase over the border.

▇ Next we must decide when Gramer arrested Benjamin. Under the Fourth Amendment, an arrest—the seizure of a person—occurs "when [an] officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen * * *." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). The government urges us to evaluate this case under recent decisions holding that if a suspect resists a show of authority, no seizure occurs until the officer secures control of the suspect. *California v. Hodari D.,* — U.S. —, 111 S.Ct. 1547, 1549, 113 L.Ed.2d 690 (1991); *Carter v. Buscher,* 973 F.2d 1328, 1333 (7th Cir.1992). Benjamin argues that his case is controlled by decisions holding that a seizure occurs when a reasonable person is not "free to leave" an encounter with the police. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). We believe that *Hodari D.* governs this case.

A common-sense analysis of the interaction between Gramer and Benjamin shows that Benjamin was not seized until Gramer maced him. Benjamin argues that Gramer had all the trappings of police authority—a uniform, a car with flashing lights, a gun—and that a reasonable person would not have felt free to leave after being pursued into Minnesota. But this misses the point, for Benjamin resisted Gramer; he walked away and ignored any authority that may have radiated from Gramer's police-like appearance. Gramer, for his part, conspicuously acted more like a private citizen than a police officer. He did not order Benjamin to do anything, he did not touch or threaten him. Gramer only walked backwards in front of Benjamin, dogging him with unwelcome attempts at conversation. Benjamin did not yield to any "show of authority" by Gramer after emerging from the wrecked auto. Instead Benjamin cursed Gramer, beat a drunken path to the house, and resisted Gramer to the point of punching at him and siccing a German shepherd on him. Under *Hodari D.,* — U.S. at —, 111 S.Ct. at 1550, no seizure occurred until Gramer maced Benjamin and thereby used force to restrain him.

Did probable cause support Benjamin's arrest at this point? Absolutely. Gramer saw Benjamin driving erratically in Minnesota. He saw signs that Benjamin was intoxicated, including spittle-prone speech, bloodshot eyes and clumsy movements. These observations gave Gramer probable cause to arrest Benjamin for drunk driving. Gramer also had seen Benjamin throw punches at him and sic a dog on him, giving Gramer additional probable cause to arrest Benjamin for assault. Although the trial judge found that Gramer had probable cause to arrest Benjamin for drunk driving as soon as Benjamin left his car, we need not reach that question since, as Chief Judge Crabb noted, this is not what Gramer did.

In sum, Benjamin's arrest was valid. His guns and post-arrest statements were properly admitted as evidence, and we affirm his conviction under 18 U.S.C. § 922(g)(1) for possessing firearms as a convicted felon.