**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Fred TAYLOR, Defendant–Appellant.**

Nos. 93–2234, 93–2265.

United States Court of Appeals, Seventh Circuit.

Argued March 28, 1994.

Decided July 29, 1994.

David H. Miller, Asst. U.S. Atty. (argued), Office of U.S. Atty., Fort Wayne, IN, for plaintiff-appellee.

Marvin Bloom (argued), Alan D. Blumenthal, Chicago, IL, for defendant-appellant.

Before CUDAHY, and RIPPLE, Circuit Judges, and PLUNKETT, District Judge.[1]

PLUNKETT, District Judge.

Fred Taylor was indicted for counterfeiting, possession of controlled substances, and use of a weapon during a drug offense. The first indictment charged possession with intent to distribute a controlled substance and the use of a firearm during and in relation to a drug transaction. These charges were tried without a jury, and Taylor was convicted on both counts in September 1992.

The second indictment charged Taylor with a single count of conspiracy to defraud the United States by counterfeiting Federal Reserve notes. Taylor was convicted by a jury on this charge in September 1992.

In May 1993, Taylor was sentenced for both convictions. The trial court imposed a combined guideline sentence of 144 months for the counterfeiting and drug convictions, and an additional and consecutive sentence of sixty months for the § 924(c)(1) firearms conviction, for a total sentence of seventeen years. Taylor appeals on four grounds. First, he argues that consent to search his garage was involuntarily obtained. Second, Taylor claims that his custodial statements were involuntary as well. Third, Taylor argues that he was not proven guilty beyond a reasonable doubt of the use of a firearm during and in relation to a drug trafficking offense. Finally, Taylor argues that the trial court erred in enhancing his sentence for obstruction of justice pursuant to U.S.S.G. § 3C1.1. We shall address each of Taylor's arguments in turn.

### Facts

Taylor was the operator of a used car dealership in Fort Wayne, Indiana called Executive Motors. Taylor had been acquainted with a man named Edson Nolan for several years. Nolan, in turn, was acquainted with a man named Jerry Cripe, a resident of a federal work-release center. In mid to late 1991, Nolan and Cripe considered entering the counterfeiting business. Nolan asked his acquaintance, Fred Taylor to finance the operation and Taylor agreed.

Soon thereafter, Cripe went to the authorities and told them of the budding scheme. After agreeing to serve as a confidential informant for the Secret Service, Cripe continued his role in the conspiracy. Counterfeiting began in earnest in early 1992 when Cripe provided the services of a printer who was an undercover Secret Service agent. Several hundred thousand $100 bills were printed on one side in Nolan's garage. However, before the bills could be completed, federal authorities arrested Nolan.

At the time of Nolan's arrest, the only evidence connecting Taylor to the conspiracy was (1) Nolan's reference to his "silent partner" as "Fred"; (2) Nolan's visits to Taylor's garage after saying he was going to show samples of the bogus money to "Fred"; and (3) the fact that Taylor paid Cripe $500 to give him proof of employment.

1. The Honorable Paul E. Plunkett, District Judge, United States District Court for the Northern District of Illinois, is sitting by designation.

However, these small buds of evidence blossomed into a bouquet when Nolan, like Cripe before him, agreed to cooperate with federal authorities. Nolan agreed to wear a wire when presenting Taylor with some finished counterfeit money provided by the government. Nolan was instructed to show Taylor the bills provided by the government and to bring boxes of the still unfinished bills into Executive Motors before the arrest was to be made.

Nolan agreed. However, his cooperation did not stop there. Nolan told the government that he often bought cocaine from Taylor at Executive Motors and that he had seen firearms there. The authorities instructed Nolan to attempt to set up a drug buy from Mr. Taylor.

Nolan called Taylor, but Taylor did not answer the phone, so Nolan left a message. Later the surveillance agents learned that Taylor had returned to the dealership, and Nolan was dispatched with the "show" counterfeit, the boxes of unfinished bills, and $13,500 in government-provided buy money for cocaine. Needless to say, numerous government agents were close behind.

When Nolan arrived, Taylor said he hadn't gotten his message. Regardless, Nolan asked for a quantity of cocaine in a prearranged code and Taylor replied that he had none on the premises but could get some. The conversation then shifted to the counterfeit, and Taylor voiced his approval of the "show" bills provided by the government. The men agreed to transfer the remainder of the bills, (which were, unknown to Taylor, unfinished), to Taylor's custody for safekeeping. The boxes were brought into the garage of the dealership.

Immediately thereafter, eight law enforcement officers appeared in Taylor's business with weapons drawn. One "bumped" into Taylor and ordered him down on the ground. Taylor complied and was handcuffed while the agents performed a protective sweep of the building. After a thirty second protective sweep of the premises, the agents put away their weapons.

The agents took Taylor to the office area after reading him his *Miranda* rights. Taylor said he understood and did not request an attorney. Then, Taylor admitted his involvement with Nolan in the counterfeit scheme. The agent then provided Taylor with a consent to search form which Taylor signed. Pursuant to Taylor's consent and with Taylor's assistance, the agents searched the dealership and found over 500 grams of cocaine in a hidden cache in the ceiling of the office restroom and a smaller cache hidden in the bottom of an ashtray in the office itself. In a corner of the office four to six feet from the ashtray and six to eight feet from the restroom, an unloaded .22 caliber rifle stood leaning against the wall.

In the several hours the agents detained him at the dealership, Taylor gave a full confession of his involvement with the counterfeit scheme and detailed his cocaine selling history. At some point however, Taylor requested an attorney and questioning was suspended until his lawyer arrived. With his retained attorney present, Taylor told the agents about his cocaine source and how he conducted his transactions with that person. When asked about his local dealers, Taylor's answers became unsatisfactory and the agents terminated the interview.

At two subsequent detention hearings before Magistrate Judge Campbell, the Magistrate Judge asked the Defendant if the pretrial services reports were correct. At the first hearing concerning the first indictment, Taylor responded that the report was correct and complete. However, when the government pointed out that Taylor had omitted certain real estate valued at $12,500 from the list of his assets in the report, Taylor agreed that the real estate was omitted. At the second hearing, Taylor again stated that the report was correct, and again the government pointed out that the report omitted $470,000 in cash found at the Defendant's home by agents earlier that day. The Magistrate Judge ordered that Taylor be detained.

At sentencing, the trial court assessed a two-level enhancement pursuant to United States Sentencing Guideline § 3C1.1 for obstructing the administration of justice. The court held that Taylor's affirmation to the Magistrate Judge that the report was correct

when it omitted the $470,000 in cash from the list of assets was a materially false statement to a magistrate. The court found that a where a magistrate is considering whether to detain a defendant based upon dangerousness and risk of flight, knowledge that the accused has access to a large sum of cash is material.

### Discussion

Several issues are presented for our review by Mr. Taylor. We shall address each in turn.

### 1. The Voluntariness of Taylor's Consent to Search and Confession

█ Taylor argues that both his consent to search and his inculpatory custodial statements were the product of a coercive police presence rather than a knowing and voluntary waiver of rights. After a pretrial motion to suppress, the district court disagreed. After careful review of the record, we must agree with the district court.

█ The question of the voluntariness is one of fact to be decided by the trial judge in light of the totality of the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878–79, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte,* 412 U.S. 218, 238, 93 S.Ct. 2041, 2053, 36 L.Ed.2d 854 (1973). The government bears the burden of proving voluntariness by a preponderance of the evidence. *Schneckloth,* 412 U.S. at 222, 93 S.Ct. at 2045; *United States v. Lechuga,* 925 F.2d 1035, 1041 (7th Cir.1991). In reviewing the denial of a motion to suppress, we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses. *United States v. Edwards,* 898 F.2d 1273, 1276 (7th Cir.1990). We will not disturb the district court's factual findings unless they are clearly erroneous. *United States v. Benjamin,* 995 F.2d 756, 758 (7th Cir.1993); *United States v. Kelly,* 991 F.2d 1308, 1311 (7th Cir.1993). A decision is not clearly erroneous unless, after a review of all the evidence, we are left with a definite and firm conviction that an error was committed. *United States v. Barnes,* 909 F.2d 1059, 1067 (7th Cir.1990).

We need not tarry long with Taylor's voluntariness arguments. The testimony of the government agents, which the district court found to be credible, adequately supports a finding of voluntariness on the part of Taylor. Though the initial shock of several armed federal agents descending upon him may have understandably upset Taylor, nothing in the record lends any support to Taylor's claims. The record shows that no agents placed a gun to Taylor's head or threatened him in any other fashion, and that weapons were holstered and other indicia of authority, such as raid jackets, were taken off within a few moments of the agents' arrival at Executive Motors.

The evidence shows that Taylor, though perhaps initially and understandably disturbed by the raid, voluntarily spoke to the officers about his guilt, and consented to their search of his premises. In fact, Taylor signed a consent form, which weighs heavily toward finding that his consent was valid. *Mendenhall,* 446 U.S. at 558–59, 100 S.Ct. at 1879–80; *United States v. Duran,* 957 F.2d 499, 501 (7th Cir.1992); *United States v. Valencia,* 913 F.2d 378, 381 (7th Cir.1990); *United States v. Morgan,* 725 F.2d 56, 58 (7th Cir.1984). He also led the agents to the hidden drugs in the bathroom ceiling. Nothing in the record, aside from the Defendant's own statements, supports Taylor's arguments. To the contrary, the record fully supports the trial judge's decision that Taylor's inculpatory statements were made voluntarily and that Taylor knowingly and willingly gave his consent to the agents to search the premises.

Defendant argues that he was suddenly accosted by nearly a dozen federal and local law enforcement agents brandishing a variety of weapons, thrown face down in the mud, and handcuffed, and that such a formulation leads to a finding that whatever cooperation followed must have been the result of an inherently coercive atmosphere. We reject that argument as contrary to the record.

The record shows that the initial melee of agents, badges and weapons, necessary to protect the safety of the agents and the confidential informant, dissipated only sec-

onds after it had begun and that all was routine once the premises had been secured. Though certainly unpleasant, there is nothing so inherently coercive about such tactics, commonly used where a danger to life or limb is perceived by law enforcement agents, to render subsequent cooperation involuntary. The evidence shows that Taylor cooperated with the agents, detailed his criminal conduct, signed a valid consent form, and led the agents to his main stash of cocaine before even asking for an attorney, and that once Taylor did ask for the assistance of counsel, no further question were asked until his lawyer arrived. Based upon the totality of the circumstances as revealed in the record, the district court's decision that Taylor's consent and inculpatory statements were voluntary was not clearly erroneous.

## 2. Use of a Firearm during and in Relation to a Drug Offense

■ Based on the presence of the unloaded .22 rifle in a corner of Taylor's office, the district court, sitting without a jury, convicted Taylor of the use of a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1). The Defendant concedes that he possessed the .22 on the day he was arrested, but contends that his use of a firearm during and related to a drug transaction was not proven beyond a reasonable doubt. We agree, and reverse the Defendant's conviction on Count II of indictment FCR 92–0007.

■ In challenging the sufficiency of the evidence, Taylor bears a particularly heavy burden. *United States v. Young,* 20 F.3d 758, 763 (7th Cir.1994); *United States v. Burrell,* 963 F.2d 976, 987 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1992); *United States v. Hernandez,* 948 F.2d 316, 321 (7th Cir.1991); *United States v. Scroggins,* 939 F.2d 416, 421 (7th Cir.1991). The evidence is viewed in the light most favorable to the government, and the conviction must be upheld if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Young,* 20 F.3d at 763; *United States*

*v. Woods,* 995 F.2d 713, 717 (7th Cir.1993); *United States v. Villarreal,* 977 F.2d 1077, 1078 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1350, 122 L.Ed.2d 731 (1993); *Burrell,* 963 F.2d at 987; *United States v. Bafia,* 949 F.2d 1465, 1475 (7th Cir.1991). We may not overturn a conviction on sufficiency grounds unless there is no evidence in the record upon which a finding of guilt could have been based. *United States v. McKinney,* 919 F.2d 405, 416 (7th Cir.1990); *United States v. Nesbitt,* 852 F.2d 1502, 1509 (7th Cir.1988). In reviewing a conviction for sufficiency of the evidence: "We refuse to reassess the credibility of the witnesses' testimony because that is the prerogative of the trial court. 'An appellate court will not weigh the evidence or assess the credibility of the witnesses.'" *United States v. Harty,* 930 F.2d 1257, 1266 (7th Cir.1991) (quoting *United States v. Ramirez,* 796 F.2d 212, 214 (7th Cir.1986)).

> Section 924(c)(1) provides, pertinent part: Whoever, during and in relation to any ... drug trafficking crime, ... uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years.

18 U.S.C. § 924(c)(1). Thus, in order to convict under this statute, the government must meet a two-pronged test. First, the statute requires proof beyond a reasonable doubt that the defendant "'use[d] or carrie[d] a firearm.'" *Smith v. United States,* —— U.S. ——, ——, 113 S.Ct. 2050, 2053, 124 L.Ed.2d 138 (1993) (quoting § 924(c)(1)). Second, the government must prove that the use or carrying was "'during and in relation to' a 'crime of violence or drug trafficking crime.'" *Id.* As Taylor concedes possession of the .22 here, the only question before us is whether the weapon was used "in relation to" a drug trafficking offense. Under § 942(c)(1), "[t]he government must prove 'some relation or connection between the underlying criminal act and the use or possession of the firearm.'" *Villarreal,* 977 F.2d at 1079 (quoting *United States v. Rosado,* 866 F.2d 967, 970 (7th Cir.), *cert. denied,* 493 U.S. 837, 110 S.Ct. 117, 107 L.Ed.2d 79 (1989)). Congress' addition of the phrase "during and

in relation to" a drug trafficking crime makes it clear that § 924(c)(1) is not merely a possession statute. *Smith,* —— U.S. at —— ——, 113 S.Ct. at 2058–59. Though the phrase "in relation to" is expansive, it does delineate the outer boundaries of § 924(c)(1):

> The phrase "in relation to" ... clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence. As one court has observed, the "in relation to" language "allay[s] explicitly the concern that a person could be" punished under § 924(c)(1) for committing a drug trafficking offense "while in the possession of a firearm" even though the firearm's presence is coincidental or entirely "unrelated" to the crime.... Instead the gun at least must "facilitat[e], or ha[ve] the potential of facilitating," the drug trafficking offense.

*Smith,* —— U.S. at ——, 113 S.Ct. at 2059 (internal quotations omitted). *See also Bafia,* 949 F.2d at 1476 ("§ 942(c)(1) does not apply to the defendant who fortuitously has a gun when he commits an entirely unrelated crime...."); *United States v. Wilson,* 938 F.2d 785, 792 (7th Cir.1991) (same), *cert. denied,* —— U.S. ——, 112 S.Ct. 946, 117 L.Ed.2d 115 (1992); *United States v. Malin,* 908 F.2d 163, 167 (7th Cir.1990) (citing, *inter alia,* S.Rep. No. 225, 98th Cong., 1st Sess. 312–314 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3490–92); *United States v. Ocampo,* 890 F.2d 1363, 1371–72 (7th Cir. 1989).

The question here, then, is whether there is sufficient evidence from which to reasonably conclude that Taylor had the .22 rifle to protect his drugs or money or to otherwise facilitate any drug trafficking. *Bafia,* 949 F.2d at 1476. We find that there is not.

The trial court apparently based its finding of guilt on the proximity of the .22 to Taylor's hidden drugs. Indeed, this circuit has recognized that drug dealers who keep weapons in close proximity to drug transactions may use the weapons "in relation to" the drug trafficking for purposes of § 924(c)(1), even where the weapons were not actually brandished or handled by the defendant. *See, e.g.,*

*Woods,* 995 F.2d at 718 (quoting *Malin,* 908 F.2d at 168); *Bafia,* 949 F.2d at 1476 (7th Cir.1991); *United States v. Wilson,* 938 F.2d 785, 791–92 (7th Cir.1991); *United States v. Vasquez,* 909 F.2d 235, 239–40 (7th Cir.1990), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *United States v. Rosado,* 866 F.2d 967, 968–69 (7th Cir.1989), *cert. denied,* 493 U.S. 837, 110 S.Ct. 117, 107 L.Ed.2d 79 (1989). However, a close examination of these cases demonstrates that they are readily distinguishable from the case at bar. Each time we have affirmed a guilty verdict under § 924(c)(1) where the defendant did not brandish or even handle the weapon, we also found that elements other than mere proximity of a weapon to drugs were involved as well. Each of those cases involved other factors that gave rise to an inference of a relationship between the weapon and drugs. Those elements, which take the evidence beyond the mere coincidental proximity of the weapon to drugs that may not support a conviction under § 924(c)(1), are lacking in the present case.

In *Woods,* for example, when the police searched a crack house in Gary, Indiana, they found an automatic pistol on a table in the living room and the defendant crouching in a closet in a bedroom. 995 F.2d at 717. However, the fact that the pistol was found in the crack house was only the beginning: considerable evidence connected the pistol to drug trafficking and to the defendant. Confidential informants and co-conspirators testified that the weapon had been received in trade for drugs, was given to the defendant, and that the defendant carried it a shoulder holster during drug transactions. There was also testimony that whenever someone knocked at the door of the house, everyone inside drew their weapons. 995 F.2d at 718.

In other cases where this circuit has upheld convictions under § 924(c)(1) where weapons were found near drugs but not actually brandished, additional facts were present that gave rise to an inference that the weapons were used "in relation to" drug trafficking. *See Villarreal,* 977 F.2d at 1079 (seven loaded weapons found among drug ledgers and drug paraphernalia); *Bafia,* 949 F.2d at 1476 (defendant carried gun in gym bag with

him as he counted money and as he and one of his distributors drove to meet the supplier); *Wilson*, 938 F.2d at 791 (gun was strategically located on top of bag containing cocaine, defendant knew it was there, that it was loaded, and that it was readily accessible should trouble arise); *Vasquez*, 909 F.2d at 239 (four handguns, one loaded and three unloaded, found in truck of car "amidst a staggering cache of narcotics."); *Malin*, 908 F.2d at 168 (fact that four sophisticated and powerful handguns were found strategically located near to large quantity of drugs made inference of use in relation to drug trafficking reasonable); *Rosado*, 866 F.2d at 968–69 (though defendant left jacket containing his gun in car because of heat, bringing concealed weapon in his jacket to drug deal sufficient under § 924(c)(1) where defendant never strayed far from car during transaction and car windows were left open and doors unlocked). *Cf. United States v. Whitley*, 905 F.2d 163, 165 (7th Cir.1990) (fact that loaded gun was found under bag of clothes within defendant's reach at time of arrest was sufficient to convict under § 924(c)(1) despite girlfriend's testimony that gun belonged to her rather than defendant).

In the present case, the facts involving Taylor's use and possession of the .22 rifle, even when viewed in the light most favorable to the prosecution, clearly show that the government did not prove beyond a reasonable doubt that the .22 was used or carried in relation to Taylor's drug trafficking. When the agents searched Taylor's garage, they found the rifle standing in a corner in Taylor's office. The rifle was only steps away from either of Taylor's two hidden caches of drugs. However, the proximity of the weapon to the drugs is the sole basis in the record for a finding that it was used "in relation to" any drug transaction. No witness testified, no evidence was adduced, and no inference arises that the .22 played even the slightest role in either intimidating a buyer or emboldening Taylor in any drug transaction.

To the contrary, the evidence shows that the weapon's presence was a mere "accident or coincidence" of the type that cannot support a conviction under § 924(c)(1). *Smith*, —— U.S. at ——, 113 S.Ct. at 2059. *See also Bafia*, 949 F.2d at 1476; *Wilson*, 938 F.2d at 792; *Malin*, 908 F.2d at 167; *Ocampo*, 890 F.2d at 1371–72. Uncontradicted testimony showed that Taylor was in the process of refurbishing the weapon for his father-in-law. The weapon was unloaded and no .22 ammunition was found on the premises. When the agents found it, a screw was missing from the foregrip, and the agents taped the weapon together before test firing it. Though Nolan had seen the weapon at various places in the garage, he did not testify that it had any effect on him or that it was ever used in any way in connection with his drug deals with Taylor. There is also no indication that the presence of the weapon emboldened Taylor in any way. Further, Taylor did not have exclusive, or even superior access to the weapon because he left Nolan alone in the office with unfettered access to both the .22 and the drugs for a time.[2] Such conduct is incompatible with any intent to use the rifle to facilitate the drug transaction.

The facts of this case are entirely inconsistent with the conduct § 924(c)(1) was intended to deter. A dilapidated and ammunition-less .22 rifle seems incongruous as a contributor to a drug transaction. A .22 is largely a target weapon and may be occasionally useful for sniping at rabbits, squirrels or, possibly, crows on a perch. We cannot imagine a drug dealer's believing it very useful for self-protection or for intimidating those with whom he deals. Of course, under "ideal" circumstances a .22 rifle can kill people, and there should certainly be no *per se* rule excluding it as a source of 18 U.S.C. § 924(c)(1) liability. But the caliber of the marginally functional rifle in this case seems to be a significant factor in determining whether it was used "in relation to" drug trafficking.

If Taylor had produced an unloaded or otherwise nonfunctional .45 and placed it on

---

**2.** The government points out that this court has repeatedly held that a weapon need not be in perfect working order, or indeed, even capable of firing a shot in order to be used "in relation to" a drug deal under § 924. However, this argu-

ment, while undoubtedly correct, is a red herring which focuses on the functionality of the weapon rather than upon its role, or lack thereof, in the transaction at issue.

his desk while negotiating a drug deal with Nolan, or indeed, if he had a loaded .38 in his desk drawer, a finding of guilt under § 924 would have been entirely proper. There can be no argument that the seller's rather conspicuous possession of what appeared to be a powerful handgun could have the dual effect of intimidating a buyer and emboldening a seller or that the concealed possession of a loaded weapon could also serve to embolden its owner.

Here however, the facts of the case, including the nature and condition of the weapon and the Defendant's access to it, which was shared with the buyer, do not support a conviction. Taylor's .22 stood, unloaded and partially disassembled, in a corner of the room. No reference, direct or indirect, was ever made to it, and Nolan had as much or more access to the weapon as Taylor did, as Taylor left Nolan alone in the room with the weapon and the drugs. Though the .22 was only feet away from the drugs that were found, no other evidence suggests any connection between the rifle and any drug transaction. Thus, in light of the clear language of § 924(c)(1) and *Smith*, the evidence is insufficient to sustain Taylor's conviction. *Smith*, —— U.S. at ——, 113 S.Ct. at 2059. *See also United States v. Derr*, 990 F.2d 1330, 1338 (D.C.Cir.1993) (proximity alone is insufficient under § 924(c)(1)).

It is axiomatic that the government must prove every element of the charged crime beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). As it has failed to present sufficient evidence to allow a rational trier of fact to find beyond a reasonable doubt that Taylor used the .22 "in relation to" a drug trafficking offense, *e.g., Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789, the Defendant's conviction on Count II of indictment FCR 92–0007 is reversed.

### 3. Enhancement for Obstruction of Justice under § 3C1.1

Based on Taylor's false statements to the Magistrate Judge that the pretrial services report was correct and complete when it, in fact, omitted reference to approximately $470,000 in cash Taylor had in his home, the

District Judge assessed a two level enhancement, pursuant to United States Sentencing Guideline § 3C1.1 for obstructing the administration of justice. Taylor appeals the enhancement, arguing that his right to refrain from self-incrimination protected his misrepresentations to the Magistrate Judge.

The district court's finding that the Defendant obstructed justice is a finding of fact reviewable only for clear error. *United States v. Pitz*, 2 F.3d 723, 730 (7th Cir.1993); *United States v. Easley*, 977 F.2d 283, 286 (7th Cir.1992); *United States v. Casanova*, 970 F.2d 371, 377 (7th Cir.1992); *United States v. Feekes*, 929 F.2d 334, 338 (7th Cir. 1991). *See also United States v. Hamilton*, 19 F.3d 350, 358 (7th Cir.1994) (findings of fact in Guidelines context reviewable only for clear error and preponderance of evidence standard applies); *United States v. Duarte*, 1 F.3d 644, 649 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994).

U.S.S.G. § 3C1.1 provides:

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

The Application Notes provide:

3. The following is a non-exhaustive list of the types of conduct to which this enhancement applies:

   (f) providing materially false information to a judge or magistrate.

5. "Material" ... information, as used in this section means ... information that, if believed, would tend to influence or affect the issue under determination.

This circuit has recognized that an enhancement under § 3C1.1 may be proper where a defendant furnishes false information during the course of an investigation by the court. *United States v. Jordan*, 890 F.2d 968, 973 (7th Cir.1989).

In a careful analysis, the district court found that Taylor's misrepresentations to the probation officer before his detention hearing were not material because the officer claimed

that Taylor's omission of the real estate and the $470,000 in cash did not affect his decision to recommend that Taylor be released on bond. However, Judge Lee felt that Taylor's misrepresentations about the money and real estate to the Magistrate Judge was "material" to a matter at issue, namely whether Taylor was a flight risk. Judge Lee concluded that the fact that a defendant who is facing a possible lengthy prison sentence has nearly half a million dollars in cash on hand was clearly material to the risk of flight.

■ Certainly, § 3C1.1 cannot be read to abrogate a defendant's Fifth Amendment rights. Had Taylor simply declined to answer the Magistrate Judge's question concerning the completeness of the report on the grounds that the answer might incriminate him, no enhancement would have been proper. However, Taylor did not simply preserve his right to refrain from self-incrimination, he affirmatively misrepresented the extent of his assets to the Magistrate Judge.[3]

We agree with Judge Lee that the fact that a defendant has nearly half a million dollars in cash in his home is material to the question of whether he is a flight risk, an issue that was in determination at the hearing.[4] The district court's assessment of a two level enhancement pursuant to § 3C1.1 is affirmed.

### Conclusion

For the reasons stated above, the Defendant's conviction for use of a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1) is reversed and the five year consecutive term imposed pursuant to that conviction is vacat-

ed. In all other respects, the Defendant's conviction and sentencing is affirmed.

AFFIRMED IN PART/REVERSED IN PART.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's affirmance of the appellant's convictions for drug trafficking and counterfeiting. I respectfully dissent from the court's reversal of the conviction for using a weapon in relation to the commission of a drug offense.

### A

I agree with my brothers that the motion to suppress Mr. Taylor's confession and the evidence obtained in the search was properly denied. I must respectfully note, however, that the court's treatment of these two suppression matters as one unnecessarily obscures an important and unsettled issue with respect to the standard of review for suppression rulings grounded in the Fifth Amendment. As this court recently pointed out in *United States v. Jones*, 21 F.3d 165, 168–69 (7th Cir.1994), there has been, without the benefit of the process required by our rules, an assumption in recent times that the deferential standard used to review Fourth Amendment suppression motions is applicable *ex proprio vigore* to the review of mixed questions of law and fact surrounding the voluntariness of a confession. There is precedent in this circuit for the proposition that the question of voluntariness is subject to a de novo review by this court. *United States v. Montgomery*, 14 F.3d 1189, 1194 (7th Cir. 1994). This approach is compatible with the Supreme Court's approach in *Miller v. Fenton*, 474 U.S. 104, 111, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985), that the issue of the voluntariness of a confession is not subject to

---

**3.** The following transpired in relation to the Defendant's assets:

> Assistant United States Attorney: Your Honor, I am unclear. Is counsel saying that these are all the assets that Mr. Taylor has; he has no other assets than what's here?
> Defense Counsel: I have to consult with Mr. Taylor. I did not have this report before five minutes ago.
> The Court: Well, consult with him, then.

> Defense Counsel: Yes, Your Honor, that's it. I just wanted to make sure. I didn't want to mislead the court.
> (Tr. I at 42.)

**4.** The fact that the government knew about the money from a search earlier that very day does not negate the materiality of Taylor's misrepresentation because section 3C1.1 applies to defendants who "obstructed or impeded, or attempted to obstruct or impede, the administration of justice." U.S.S.G. § 3C1.1.

the presumption of correctness in § 2254(d) proceedings. I also note that this court has held just recently that the determination of whether a person is in custody for purposes of *Miranda* warnings is a matter of law that we review de novo. *United States v. Menzer,* 29 F.3d 1223, 1230 (7th Cir.1994).

The issue of voluntariness hinged substantially on the credibility findings of the district court. Whatever standard of review is employed on appeal, the determination of the district court ought to be upheld.

## B

The issue of the sufficiency of the evidence with respect to the firearms offense is indeed a close one and it is only after a great deal of study of the record and reflection that I conclude that I cannot join my brothers in the reversal of the conviction. Here, unlike the issue I have just discussed, the standard of review is all important. In my view, there is sufficient evidence in the record to support the view that the presence of the weapon facilitated the commission of a drug offense because it placed the purchaser on notice that the defendant was quite willing to protect his investment with a firearm. Indeed, the record shows that the informant, upon returning to the officers, told them the defendant liked firearms and that he had them on the premises. There was further evidence that the officers, upon receipt of this information, formulated a plan to deal with the contingency that such firearm would be used when the defendant was confronted with law enforcement agents.

The transcript of this trial makes clear that, despite the many cases that we have decided, we have yet to give sufficient practical guidance to the trial courts on this issue. We need to begin to place principled limitations on the "during and in relation to" language of the statute. Our fact intensive adjudication of cases up to this point does not do the job. To the extent that my brothers' conclusion in this case reflects that need, I am in agreement with them. Regretfully, I must part company from them with respect to the facts of this case because I believe that the presence of the weapon facilitated the offense.