81 F.3d 164
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lonnie R. WATSON, Defendant-Appellant.
 No. 95-3447.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 28, 1996.
Decided March 27, 1996.
 
 Before COFFEY, EASTERBROOK and KANNE, Circuit Judges.
 
 ORDER
 
 1
 After being observed flagging down cars and reacting suspiciously to the approach of police officers, Lonnie R. Watson was found with a gun in one pocket and drugs in another. After a jury trial, he was convicted of violating 18 U.S.C. § 924(c)(1) for carrying a weapon during and in relation to the offense of possessing with intent to distribute crack cocaine, 21 U.S.C. § 841(a)(1), to which he had pleaded guilty before trial. He claims that his § 924(c)(1) conviction violated due process because the jury lacked sufficient evidence to find that he had carried the weapon "in relation to" the drug trafficking offense. We review the evidence in the light most favorable to the government to determine whether any reasonable trier of fact could have found the requisite nexus between the gun and the drug trafficking offense beyond a reasonable doubt. See United States v. Johnson-Dix, 54 F.3d 1295, 1302 (7th Cir.1995). We affirm.
 
 
 2
 According to evidence adduced at trial, on May 2, 1994, Deputy Vince Keifer and Auxiliary Deputy Steve Burrows were driving their patrol car in a high crime area near the corner of 15th Street and State Street in East St. Louis, Illinois, at 2:30 a.m. The officers believed that they spotted Watson and another man, Jonathan Walker, flagging down cars. When the two men saw the police car, Walker pretended to use a pay phone, while Watson started walking in circles. In Officer Kiefer's opinion, their suspicious behavior might very well be consistent with attempting to sell drugs to passers-by. The officers circled back. Officer Kiefer approached Watson and asked him for identification. When Watson reached into his right pocket, Officer Kiefer grabbed Watson's pocket from the outside and felt a small weapon. In Watson's written voluntary statement of May 2, 1994, he said that after being asked for identification, "I started to go into my pocket for my ID and the police told me to get down on the ground," and that "[b]efore I was put on the ground and searched I had reached into my right ou[t]er coat pocket and was about to give the policeman the gun when he grabbed it in my hand." (Defendant's Ex. 1.) The subsequent search of Watson produced a loaded .25 caliber blue steel Beretta and a brown pill bottle containing three "rocks" of crack cocaine, which altogether amounted to 0.3 grams of the drug. The rocks were worth roughly $20 each. Meanwhile, Officer Burrows patted down Walker and felt something in Walker's pocket. At this point, Walker ran and while fleeing discarded a fully loaded .38 caliber revolver as he ran. Officer Burrows apprehended him.
 
 
 3
 At trial, Watson, who did not testify, relied on his statement to the police that he had brought the gun along to sell it. Officer David Clark, a deputy with the St. Clair County Sheriff's Department who was assigned to a state and federal drug task force, interviewed Watson on May 2, 1994. He also witnessed Special Agent Marakas' interview with the defendant the next day. According to Officer Clark, Watson said that he had bought the Beretta from an individual named "Wes" or "Wesley" for $20 a couple of days before his arrest. Watson also said that he had been in town to visit his sister and that he had needed to sell the drugs and the gun in order to earn money for a bus ticket back to his home in Tennessee. However, Walker said that he had seen Watson with the gun over a week prior to the arrest. Officer Clark estimated that this weapon could usually be sold in a day in East St. Louis.
 
 
 4
 Officer Clark also provided general testimony on the relationship between drugs, gang members and guns. Watson had been a member of the Renegade Vice Lords for seven years, while Walker identified himself as a member of the Insane Vice Lords, a rival subsection of that gang. Officer Clark, who had worked on over 700 drug cases, estimated that over half of them had involved guns. He testified that a drug-dealing gang member would carry a small weapon like the Beretta for personal protection against both potential clients who might rob him and members of rival gangs.
 
 
 5
 Section 924(c)(1) states in pertinent part: "Whoever, during and in relation to any ... drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years...." The phrase "in relation to" is interpreted expansively, but it does require at a minimum that the weapon have "some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." Smith v. United States, 113 S.Ct. 2050, 2059 (1993). Carrying a gun facilitates or has the potential for facilitating possession of a drug with intent to distribute it by providing both a means of protection against theft and a sense of security that emboldens the criminal. See United States v. Harmon, 996 F.2d 256, 258 (10th Cir.1993). Watson concedes that evidence showing that he carried the Beretta to provide a sense of security in relation to his offense would suffice to meet the requirements of due process. He disputes the existence of such evidence.
 
 
 6
 Watson was carrying a loaded, accessible weapon in his pocket. Watson's written statement that "he was about to give the policeman the gun when he grabbed it in my hand" reflects that he was well aware that he was carrying the gun at the time that he was arrested. This case is not one devoid of evidence that the defendant knew of the existence of the weapon, despite its proximity, United States v. Chairez, 33 F.2d 823, 826 (7th Cir.1994), or one involving a decrepit, unloaded weapon so situated that a reasonable person could not infer that it played the slightest role in the offense, United States v. Taylor, 31 F.3d 459, 466 (7th Cir.1994). Watson attempts to distinguish numerous prior cases that used circumstantial evidence to establish the nexus between a gun and the drug trafficking offense by pointing out that the prior cases involved frequent possession of a weapon, discovery of multiple weapons or the presence of a substantial quantity of money or drugs. E.g. Taylor, 31 F.3d at 465-66 (collecting cases). He stresses in contrast the relatively low value of the drugs in his case. "It is hard to imagine someone feeling a need to use a gun to protect such a paltry treasure trove." (Appellant's Br. at 10.) However, despite Watson's assertion to the contrary, the government's evidence does not amount solely to generalized expert testimony concerning drug dealers and gang members.[1]
 
 
 7
 Even without a staggering cache of drugs or money, the jury in all probability inferred from the circumstances surrounding Watson's possession of the drugs that there was a connection between the gun and the drug offense. He was flagging down people at 2:30 in the morning in a high crime area in order that he might sell drugs. He belonged to the Vice Lords, which operated in this neighborhood at the same time that a rival gang, the Disciples, also did. Whether or not he was selling the cocaine on the gang's behalf at the time, his affiliation added to the potential risk. The Beretta was loaded and readily accessible.[2] He provided the police with a dubious explanation for its presence.[3] His companion also carried a loaded weapon. In reviewing the sufficiency of the evidence, "our role is 'exceedingly narrow,' ... and we will not second guess a jury on credibility issues." United States v. Hickok, No. 95-1619, 1996 WL 84252, slip op. at * 12 (7th Cir. Feb. 28, 1996) (citation omitted); United States v. Pulido, 69 F.3d 192, 205-06 (7th Cir.1995); United States v. Woody, 55 F.3d 1257, 1265 (7th Cir.), cert. denied, 116 S.Ct. 234 (1995). Obviously, the jury found the officers' testimony more credible. The jury could reasonably infer that Watson's clear intent to sell the crack cocaine lead him into a dangerous situation, that he knew it and that he did not carry the Beretta by coincidence. There is adequate evidence in the record to support the jury's reasonable finding that Watson's possession of a loaded Beretta while selling crack cocaine on a street corner in a high crime area at 2:30 a.m. constituted carrying a firearm "in relation to" a drug trafficking crime.
 
 
 8
 AFFIRMED.
 
 
 
 [1]
 We note that such expert testimony may assist the jury in understanding the evidence or determining an issue of fact. Cf. United States v. Hubbard, 61 F.3d 1261, 1274 (7th Cir.1995) (discussing various uses of expert testimony concerning drug dealers). Officer Clark's testimony concerning drug dealing gang members choices of certain types of weapons for certain purposes or situations could help the jury assess Watson's possession of the particular gun in this case
 
 
 [2]
 The fact that Watson immediately reached into the pocket containing the Beretta when confronted by the police does not help his case. Although his voluntary statement contains inconsistent innocent explanations that he was reaching for his identification and that he was taking hold of the gun in order to hand it over, his act might also be construed under the circumstances as a motion either to reassure himself or to resist arrest
 
 
 [3]
 Although Watson claims that nothing rebuts his statement to the police that he had planned to sell the gun, a reasonable trier of fact could wonder why a man desperately in need of money would allegedly buy a gun for $20 only to attempt sell it two days later. According to Officer Clark, the weapon's sale value varies with the vendor. For example, purchasing it from a crack cocaine addict would cost from $10 to $30, while buying it from a professional fence could cost from $30 to $50. Watson, who was by his own account impoverished and selling the Beretta to random passers-by, would be analogous to Officer Clark's addict, another needy occasional merchant. Although he could have been ignorant of current prices or had unrealistic expectations, the gun appears to be a poor investment choice for Watson, who had been a member of a street gang for years. Furthermore, it seems odd that he would sell a loaded gun to strangers instead of providing the bullets separately, since the weapon could readily be turned on him. Walker's statement also contradicted at least one aspect of Watson's statements. In light of these contradictions, the jury could conclude that Watson had lied to the police to minimize his punishment